UNITED STATES of America, Appellee,

v.

**Peter UNDERWOOD,
Defendant, Appellant.**

**No. 89–1315.**

United States Court of Appeals,
First Circuit.

Heard June 6, 1988.
Decided July 24, 1989.

John A. MacFadyen, for defendant, appellant.

James H. Leavey, Providence, R.I., Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief for U.S.

Before BREYER, REINHARDT,* and TORRUELLA, Circuit Judges.

BREYER, Circuit Judge.

Peter Underwood appeals from his conviction for contempt of court, a conviction that rests upon his refusal to testify at the trial of Stuart Newton and Thomas Gilbert, whom, in July 1983, Underwood allegedly helped to smuggle drugs. Underwood says that the Fifth Amendment protects his refusal to testify at that trial because his testimony might be used against him in his own drug-smuggling case, which prosecution was taking place at about the same time, before the same judge. Underwood feared that the judge would use his testimony against him, either in deciding whether to accept his guilty plea, or in sentencing him.

* Of the Ninth Circuit, sitting by designation.

In our view, because the government gave Underwood immunity, the Fifth Amendment did not give Underwood the right to refuse to testify at the Newton/Gilbert trial; hence, his contempt conviction is lawful. We believe, however, that the sentence of three years' imprisonment that the court imposed on Underwood is unlawfully long. We will therefore require the district court to impose a new sentence, which, in light of analogous Sentencing Guidelines, may not exceed six months.

## I.

### Background

To understand the legal arguments in this case, one must consider both the drug charges the government brought against Underwood, and its separate effort to have Underwood testify against Newton and Gilbert. We shall discuss the two proceedings separately.

### A.

### The Drug Case against Underwood

In June 1988 the Government charged Underwood with having participated in a drug smuggling scheme to import about 20,000 pounds of hashish into Rhode Island in July 1983. The indictment, in four counts, charged Underwood with possessing and importing marijuana, and conspiring to do both. 21 U.S.C. §§ 841(a)(1), 952, 960(a)(1). The following are the key procedural events:

1. *October 18, 1988.* The government and Underwood, appearing before Judge Torres, asked him to accept a plea agreement providing (a) that Underwood would plead guilty to conspiracy to import marijuana (and he would also plead guilty to a separate information charging him with failure to file a tax return for 1983, under 26 U.S.C. § 7203); (b) that the court would dismiss the three other charges; and (c) that the court would impose a specific sentence of three years (less any time imposed on the related tax charge) for conspiracy to

import. *See* Fed.R.Crim.P. 11(e)(1)(A), (C) ("charge" and "sentence" bargaining). The court, as Fed.R.Crim.P. 11(e)(2) allows, "defer[red] its decision" about whether or not to accept the plea agreement, "until there [was] ... an opportunity to consider the presentence report."

2. *December 15, 1988.* The court listened to the reasons why the parties wished to enter the plea agreement. They included Underwood's fairly minor role in the July 1983 smuggling, consisting of unloading the ship; his crime-free life since 1983; and his early offer to plead guilty, knowing that other potential witnesses in the case were out of the country. The court read the presentence report. It then decided to reject the plea agreement as too lenient, and it reinstated Underwood's plea of not guilty. Fed.R.Crim.P. 11(e)(2), (4) (court may reject plea bargain).

3. *January 5, 1989.* The parties returned to Judge Torres with a new plea agreement, an agreement that effectively would allow Judge Torres to sentence Underwood to five years' imprisonment. Underwood would plead guilty to one count charging importation of marijuana, a count that carried a statutory maximum penalty of five years, and that also provided for a special parole term of up to life, 21 U.S.C. § 960(b)(2), (c) (1982), and the court would dismiss the remaining charges. Underwood also agreed to plead guilty to the charge of failure to file a tax return, and the government agreed that any sentence imposed for the tax offense would run concurrently with the sentence for the drug charge. *See* Fed.R.Crim.P. 11(e)(1)(A), (C).

The court then said it had learned that Underwood had participated in two earlier marijuana smuggling operations, in 1981 and 1982, and asked the parties why this information was not included in the presentence report. The court indicated that it might ask for a supplementary presentence report covering this prior conduct. It also said it wanted to be certain that Underwood's sentence was fair in comparison to the sentences given to others involved in the 1983 smuggling, who would be sentenced the following Monday, January 9.

The court continued the plea hearing until January 9.

4. *January 9, 1989.* Underwood, pursuant to the plea agreement, entered a conditional plea of guilty to the importation count. The court deferred its decision whether or not to accept the plea agreement, until it received a supplementary presentence report focusing on Underwood's participation in 1981 and 1982 drug smuggling. Fed.R.Crim.P. 11(e)(2). The court set a new hearing date of March 16, 1989 for its determination whether to accept the plea, and for possible sentencing.

5. The events leading to the contempt charge occurred between January 9 and March 16, 1989.

6. *March 16, 1989.* The court rejected the plea agreement. Underwood withdrew his guilty plea, reinstated his plea of not guilty, and began to prepare for trial.

### B.

### *The Effort to Compel Underwood's Testimony*

In January 1989, Judge Torres was also conducting the trial of Stuart Newton and Thomas Gilbert, who allegedly were major figures in the July 1983 smuggling operation. The government had said, during Underwood's various plea hearings, that it probably would not call Underwood as a witness at Newton's and Gilbert's trial. Nonetheless, it did so, during the very time that Judge Torres was considering whether to accept Underwood's second proposed plea agreement. The key events are as follows:

1. *January 13, 1989.* The government subpoenaed Underwood to testify at Newton's trial. Underwood moved to quash the subpoena.

2. *January 18, 1989.* The government, because Underwood objected to testifying on Fifth Amendment grounds, asked Judge Torres to grant Underwood immunity from all future use of his testimony against him, as set forth in 18 U.S.C. §§ 6002, 6003. Judge Torres did so. Underwood explained that, despite the immunity, he still thought that his testimony might be used against

him. He feared that Judge Torres, who would hear the testimony since he was presiding over Newton's and Gilbert's trial, would inevitably use it against him in deciding whether to accept his plea agreement, or in sentencing him. He also feared that the prosecutor in charge of Newton's and Gilbert's trial, who was also handling his own case, might use his testimony against him in later proceedings. Judge Torres, after mentioning the possibility of later recusal, and noting that Underwood's testimony would probably reveal no more about Underwood's crimes than the judge already knew, concluded that the Fifth Amendment did not give Underwood a right to refuse to testify. He ordered Underwood to obey the subpoena. Underwood, citing the Fifth Amendment, refused. The court then held Underwood in civil contempt and ordered him incarcerated.

3. *February 27, 1989.* The court, after an appropriate charge and hearing, found Underwood guilty of criminal contempt for having refused to testify, under 18 U.S.C. § 402.

4. *March 16, 1989.* On the same day that Judge Torres rejected the second proposed plea agreement, *see* p. 614, *supra,* the court sentenced Underwood to three years imprisonment on the contempt charge, a sentence that Underwood began to serve in mid-April 1989. Underwood now appeals from the judgment embodying this contempt conviction and the three-year sentence.

## II.

### *The Contempt Conviction*

■ A. Underwood's basic legal argument is that the district court's order that he must testify violates the Constitution's Fifth Amendment. The Supreme Court has written that a witness invoking the Fifth Amendment's privilege against compulsory self-incrimination

> may not be required to answer a question if there is some rational basis for believing that it will incriminate him, at least without *at that time* being assured

that neither it nor its fruits may be used against him.

*Minnesota v. Murphy,* 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984) (quoting *Maness v. Meyers,* 419 U.S. 449, 473, 95 S.Ct. 584, 598, 42 L.Ed.2d 574 (1975) (White, J., concurring in result)); *see In re Kave,* 760 F.2d 343, 354–55 (1st Cir.1985) (privilege protects witness against any "reasonable possibility" of use of testimony against him). Underwood points out that, not only would the prosecutor hear his self-incriminating testimony, but also Judge Torres himself would hear his compelled testimony just prior to reaching a decision whether to accept his plea and, perhaps, sentencing him. Judge Torres, in Underwood's view, could not avoid using Underwood's answers against him in making these determinations, at least subconsciously. Underwood says that, if Judge Torres would not grant his motion to quash the subpoena, he should at least have recused himself from all further proceedings in Underwood's drug case, and promised Underwood that he would do so "at that time," *i.e.,* on January 18, so that Underwood would be "assured" that his testimony would not be used against him. *See Murphy,* 465 U.S. at 429, 104 S.Ct. at 1143.

The peculiar circumstances of this case lead us to reject this argument. We find it unpersuasive, as a matter of law, because of the combined effect of the following two considerations.

1. The relevant immunity statute, 18 U.S.C. § 6002, explicitly states that a witness who receives immunity "may not refuse to comply" with an order to testify,

> but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case.

The Supreme Court has held that the immunity this statute provides "is coextensive with the scope of the privilege against self-incrimination, and therefore is sufficient to compel testimony over a claim of the privilege." *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1661, 32

L.Ed.2d 212 (1972). The immunity statute prohibits the government and the courts from using any compelled statement that Underwood might make, or any information "derived" from any such statement, at the sentencing stage of his drug case, just as it forbids its use at any other stage. *Estelle v. Smith,* 451 U.S. 454, 462–63, 101 S.Ct. 1866, 1873, 68 L.Ed.2d 359 (1981) (there is "no basis to distinguish between the guilt and penalty phases ... so far as the protection of the Fifth Amendment privilege is concerned"). Moreover, as the Supreme Court has also pointed out, once a witness claims that the government has used his testimony against him, the *government* must prove that no such use has occurred. The Court said:

> This burden of proof ... is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.
>
> This is very substantial protection, commensurate with that resulting from invoking the privilege itself. This statute ... affords the same protection by assuring that the compelled testimony can in no way lead to the infliction of criminal penalties.

*Kastigar,* 406 U.S. at 460–61, 92 S.Ct. at 1665. Thus, insofar as the Fifth Amendment bars the prosecutor from using Underwood's testimony against him, and insofar as it bars Judge Torres from basing plea-acceptance and sentencing decisions on Underwood's compelled testimony, the immunity statute likewise protects Underwood against any such use. *See United States v. Serrano,* 870 F.2d 1, 17 (1st Cir. 1989) (purpose of immunity grant is "not automatically frustrated by the government's mere exposure to immunized testimony" or by the possibility that the " 'immunized testimony might have tangentially influenced the prosecutor's thought processes in ... preparing for trial' ") (citation omitted); *United States v. Garrett,* 797 F.2d 656, 664 (8th Cir.1986) (remedy for possibility that grand jury took immunized testimony into account "in some conscious or unconscious way" in indicting witness, is a taint hearing at which government must show that indictment rests on independent evidence); *In re Liddy,* 506 F.2d 1293, 1301 (D.C.Cir.1974) (witness whose conviction was on appeal, and who feared that his testimony would be used against him on retrial, could be compelled to testify because immunity would adequately protect him).

2. When Underwood opposed the government's efforts to compel his testimony, he asked Judge Torres, if the judge were to decide to compel Underwood to testify, to recuse himself from subsequent proceedings in Underwood's drug case. We concede that it is unclear whether the immunity statute would *require* Judge Torres to recuse himself, for the extent to which the law presumes that a sentencing judge can disregard improper evidence is itself unclear. *Compare United States v. Patrick,* 542 F.2d 381, 392 (7th Cir.1976) (proper way to assert claim of privilege, when defendant fears judge will use immunized testimony in sentencing, is to seek "a change of judge for sentencing purposes"); *United States v. Wilson,* 488 F.2d 1231, 1233 (2d Cir.1973) (if appellants "doubted the ability of [the judge] to put out of his mind" their immunized testimony, proper remedy was to request a different judge for sentencing), *reversed on other grounds,* 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975), *with United States v. Foley,* 871 F.2d 235, 240 (1st Cir.1989) (judges are presumed not to consider inadmissible evidence in making findings). Thus, Underwood's request for recusal was reasonable. But, Judge Torres' response was also reasonable. He made clear to Underwood that recusal was "a possibility," and that he was "prepared to look at ... alternatives" such as recusal. The fact that Judge Torres went no further—he did not decide then and there to recuse himself —did not reflect an effort to deny Underwood "assurance" that his testimony would not be used against him, *see Murphy,* 465 U.S. at 429, 104 S.Ct. at 1143, so much as it represented a response to special circum-

stances that, in part, Underwood himself created.

First, the prosecutor had assured the court that he would ask Underwood questions only "about the event of 1983, same event he has plead guilty." And, in response to a question by the court, the prosecutor further said that the questioning would be "only about matters that are the subject of the indictment." The court later said that Underwood's counsel would have "the right to object to any particular question that seems to you to be beyond the scope of the Court's ruling." Second, Underwood's counsel not only failed to press for an immediate recusal decision; rather, he indicated that he did not, in fact, want Judge Torres to recuse himself. He said that, if the judge were to decide that recusal is

> an appropriate remedy, Mr. Underwood may well move to vacate his plea of guilty.... [as the plea] was certainly based upon discussions he had with his lawyers concerning what judge that is going to judge his sentence.... If in the midstream, this Court decides it's going to go to another judge, then certainly Mr. Underwood should be permitted the opportunity to say I'd like to re-evaluate whether I intend to plead guilty.

Thus, defense counsel left Judge Torres with the impression that Underwood wanted him (a) to continue to preside over Underwood's drug case, but (b) to recognize that he could not put Underwood's potentially damaging immunized testimony out of his mind, and therefore (c) to refuse to order the testimony. Third, if Underwood had testified, then asked Judge Torres to recuse himself, and if Judge Torres, instead of doing so, had accepted his guilty plea and sentenced him (or rejected his plea and tried him), then Underwood could have appealed any resulting conviction or sentence on the ground that the Judge's decision to reject the plea agreement, and/or to impose a harsh sentence, was tainted by the use of Underwood's compelled testimony against him. *See Kastigar,* 406 U.S. at 460–61, 92 S.Ct. at 1664–65.

These circumstances, taken together, indicate that the immunity statute protected Underwood from any unconstitutional use of his compelled testimony against him; that Underwood had remedies against any such use; and that, as of the January 18 hearing, because of Underwood's counsel's statement, it made perfect sense for the judge to wait to see whether the compelled testimony would reveal any new incriminating information, before deciding whether to recuse himself (given the risk that recusal would provoke Underwood to withdraw his guilty plea). All this is to say that Underwood's compelled testimony could not have been used against him in any way that the Constitution forbids, and, as of the January 18 hearing, he had as much assurance of this fact "at that time," *see Murphy,* 465 U.S. at 429, 104 S.Ct. at 1143, as was reasonable in the circumstances.

We have found no authority suggesting that the Constitution entitled Underwood to any more assurance than, in fact, he received. Indeed, in a rather similar case, we affirmed a contempt order against a witness who refused to testify because the parole commission might later use his immunized testimony in considering whether to revoke his parole. We said

> The immunity granted appellant is coextensive with his fifth amendment protection. If in the future an attempt is made to use appellant's testimony against him in a way appellant feels violates the grant of immunity to him, then appellant may assert his privilege at that time.

*In re Doyle,* 839 F.2d 865, 867 (1st Cir. 1988); *see also In re Grand Jury Proceedings,* 835 F.2d 375, 376 (1st Cir.1987) (witness who feared he would be fired from government job and deprived of pension, because of his testimony, must testify and raise claim of privilege later, if the state tries to take his pension away; he cannot "secure an advance determination of this matter or refuse to testify on the possibility that in the future the Commonwealth might seek to use his testimony").

■ B. Underwood also argues that this court should use its "supervisory powers" to rule that the prosecutor acted im-

properly in seeking to compel his testimony. He points to the fact that he had not promised to testify as part of his plea agreement. He also seems to suggest that the government did not really need his testimony to convict Newton and Gilbert (who were both convicted even without Underwood's testimony), and instead was surreptitiously seeking "unilateral discovery" as to his own case. But, the government never promised *not* to call Underwood as a witness; instead, the prosecutor clearly and repeatedly said, during Underwood's plea hearings, that he saw Underwood as a "back up" witness who would be called if his testimony were needed. Nor does the record suggest that the government's decision to call Underwood was made in bad faith, for some improper purpose. Underwood had already admitted to his role in the smuggling operation, as the government summarized it at his plea hearings. The prosecutor had assured the court that he would only question Underwood, at the trial, about the 1983 events that were the subject of the indictment, and Underwood's counsel would be permitted to object to any questioning outside this narrow range. Thus, we do not see how the prosecutor could have elicited additional, damaging information from Underwood at the trial, or why he would have any motive to do so. We can find no abuse or impropriety sufficient to warrant the exercise of any "supervisory power" in Underwood's favor. *Cf. United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983) (courts may use supervisory powers to "formulate procedural rules not specifically required by the Constitution" for three purposes: "to implement a remedy for violation of recognized rights ... to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury ... and finally, as a remedy designed to deter illegal conduct") (citations omitted); *Grunewald v. United States*, 353 U.S. 391, 424, 77 S.Ct. 963, 984, 1 L.Ed.2d 931 (1957) (exercising supervisory power to bar trial judge from allowing cross-examination of *non*-immunized grand jury witness about his assertion of fifth amendment privilege, because of "the danger that the jury made impermissible use of the testimony").

■ C. Underwood argues that, even if the court's order to testify was lawful, he was not "*willfully* disobeying ... any lawful ... order ... or command" of the district court. 18 U.S.C. § 402. His refusal, he says, was not willful, because he relied in good faith upon his counsel's advice that the subpoena was unlawful and that he must refuse to testify in order to preserve the issue for appeal. Here, unlike the defendant in *United States v. Armstrong*, 781 F.2d 700 (9th Cir.1986), Underwood was specifically "instructed" by the district court "as to his duty to obey the order." *Id.* at 711 (Reinhardt, J. dissenting). And, the Supreme Court has made clear that a witness who seeks to preserve an appellate issue in this way must run the risk of "an adjudication of contempt if his claims are rejected on appeal." *United States v. Ryan*, 402 U.S. 530, 533, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971); *see also Maness v. Meyers*, 419 U.S. 449, 463, 95 S.Ct. 584, 593, 42 L.Ed.2d 574 (1975) (resisting a subpoena, and thereby risking "a final criminal contempt judgment against the witness if, on appeal, [counsel's] advice proved to be wrong," is a "familiar procedure" for obtaining precompliance appellate review of a claim of privilege). We have held that a court may convict a person of contempt for "willful" disobedience of a court order, even though the person believes in good faith that the court order is unlawful. *Matter of Providence Journal Co.*, 820 F.2d 1342, 1346 (1st Cir.1986) ("a party subject to a court order must abide by its terms or face criminal contempt," even if he thinks the order is unlawful), *modified*, 820 F.2d 1354 (1st Cir.1987); *United States v. Nightingale*, 703 F.2d 17, 18–19 (1st Cir.1983) (witness cannot resist subpoena while challenging it on appeal; "defendants here cannot be absolved of their contemptuous conduct because they appealed.... They made a deliberate decision to refuse a court order to testify; they must now face the consequences of that decision"); *see also United States v. Monteleone*, 804 F.2d 1004, 1011 (7th Cir.1986)

("an attorney may not exculpate his client of contempt by advising him to disobey an order of the court because the judge is 'wrong'"); *Armstrong*, 781 F.2d at 706 (good faith reliance on counsel's advice to disobey a court order is not a defense to contempt). We find the law settled on this point, in the government's favor.

## III.

### Sentence

■ After convicting Underwood of criminal contempt, the district court imposed a sentence of three years' imprisonment, a sentence that current law, unlike the law applicable to crimes committed before November 1, 1987, requires Underwood to serve without the possibility of parole. *See* 18 U.S.C. §§ 3551 *et seq.* The new law, however, also makes applicable the Sentencing Guidelines, and it permits Underwood to appeal his sentence on the grounds that the sentence "was imposed as a result of an incorrect application of the sentencing guidelines," or that it "was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable." 18 U.S.C. § 3742(e)(2), (4). If the district court has erred in either of these ways, we are to "remand the case for further sentencing proceedings with such instructions as [we consider] appropriate." 18 U.S.C. § 3742(f).

The Guideline index specifies that the Guideline applicable to violations of 18 U.S.C. § 402 is § 2J1.1, *Contempt.* That Guideline reads as follows:

If the defendant was adjudged guilty of contempt, the court shall impose a sentence based on stated reasons and the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

The Commission's Commentary makes clear that this provision, in fact, is not a sentencing guideline; it says that, since the nature of the conduct underlying contempt convictions varies significantly, "the Commission has not provided a specific guideline for this offense." The statute, § 3553(a)(2), that the guidelines provision cross-references simply consists of a statement of the basic purposes of punishment

—just deserts, deterrence, incapacitation, and rehabilitation. Thus, we conclude that "there is no applicable sentencing guideline," and we must therefore determine whether the sentence is "plainly unreasonable," under 18 U.S.C. § 3742(e)(4).

In doing so, we must consider the district court's findings and the reasons it gave for the sentence. The court found: (1) that Underwood's contempt "was not accompanied by any disrespect or disruptive acts;" (2) that it was based on a "good faith belief ... that there was some legal basis for refusing to answer;" and (3) that Underwood "has no prior convictions," and "his previous involvement in marijuana importations ... did not result in convictions," so it was not a "compelling factor in this case." We also note that Underwood's refusal to testify did not affect the outcome of Newton's and Gilbert's trial; both defendants were convicted. The court, nonetheless, imposed the three-year sentence because of "the effect of [Underwood's] ... actions on the administration of justice," and the "need to vindicate the authority of this Court."

In evaluating the reasonableness of the sentence, we must also take account of the statutory directive contained in 18 U.S.C. § 3553(b). The last sentence of that provision reads as follows:

In the absence of an applicable sentencing guideline ... the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses and offenders, and to the applicable policy statements of the Sentencing Commission.

The "applicable policy statement" of the Sentencing Commission, in this case, is a cross-reference in its Commentary on the contempt guideline, § 2J1.1, which reads "*See*, however, § 2X5.1 (Other Offenses)." Section 2X5.1 says:

If ... no guideline expressly has been promulgated, apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b) shall control.

These various statements all amount to the same thing; they tell the district court to look for analogies. And, in deciding whether the sentence is "plainly unreasonable," that is also what we must do.

■ Using the appropriate Guidelines analysis, we must conclude that the sentence of three years (actual time served) is unreasonably long, and "plainly" so. For one thing, a sentence of three years actually served (without the possibility of parole) is roughly comparable to a pre-Guideline sentence of about nine years (assuming that parole is granted as soon as the offender is eligible for it). We have found no prior case in which a witness, in good faith but incorrectly, asserted a Fifth Amendment right to refuse to testify, and the court of appeals affirmed a pre-Guidelines sentence of more than five years; most sentences in such cases are far less. *See, e.g., Maness,* 419 U.S. at 455, 95 S.Ct. at 589 (potential witness and his attorney both received sentences of 10 days in jail and a $200 fine); *Monteleone,* 804 F.2d at 1011–12 (court rejected good faith defense and affirmed four year contempt sentence, but pointed out that defendant "was sentenced on a record that included more than just his contemptuous conduct"); *Armstrong,* 781 F.2d at 702, 706–07 (court rejected good faith defense, and affirmed $500 fine); *United States v. Berardelli,* 565 F.2d 24, 27–31 (2d Cir.1977) (court rejected good faith defense and affirmed five year sentence, where district court had found that the contempt was "flagrant" and that it had made the government waste substantial time and money).

For another thing, the Guidelines impose three-year sentences, which (for an offender with no prior convictions) are equivalent to level 19 or 20 on the Guidelines chart, *see* § 5A, for such crimes as aggravated assault with serious bodily injury, § 2A2.2(b)(3)(B), theft of more than $5 million, § 2B1.1(b), or importation of 50 grams of heroin or 250 grams of cocaine, § 2D1.1(a)(3)—all crimes far more serious than the crime here at issue.

Finally, a closely analogous guideline, "§ 2J1.5, *Failure to Appear by Material Witness*" has a base offense level of 6, applicable to instances in which a witness intentionally fails to appear in court and testify in a felony proceeding. We have set out § 2J1.5 as an Appendix. The three level increase provided as a "specific offense characteristic" in § 2J1.5, for cases where the "offense substantially interfered with the administration of justice," would not apply to Underwood since Newton and Gilbert were convicted anyway. *See* § 2J1.5, Application Note. None of the other offense level adjustments listed in the Guidelines apply to Underwood's case. Although the district court might decide to reduce the sentence by two levels for "acceptance of responsibility," § 3E1.1, we cannot now say that it would be "plainly unreasonable" not to do so. *See* § 3E1.1, Application Note 5 (the "sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," so "the determination of the sentencing judge is entitled to great deference"). We can take no account of any past criminal conduct, in light of the district court's express determination that it would not do so. Thus, the result, if Underwood were charged for the similar offense of failure to appear, would be a level six sentence of 0–6 months, far less than the three year sentence he received.

The only other Guideline that is arguably analogous, § 2J1.2, *Obstruction of Justice,* has a base offense level of 12. This Guideline, however, does not offer an appropriate analogy, given the finding by the district court that Underwood asserted his Fifth Amendment claim in good faith. Underwood, according to the district court's express findings, did not intend to "obstruct justice;" he simply intended not to testify. In that sense, he intended only to "fail to appear" as a "material witness" in Nelson's and Gilbert's trial. Thus, § 2J1.5 offers the closest analogy.

For these reasons, we conclude that any sentence in excess of six months, the maximum sentence under the guidelines for a witness' failure to appear, is "plainly unreasonable," and hence unlawful. 18 U.S.C. § 3742(e)(4). On remand, the district court shall resentence Underwood. The

court may not impose a sentence greater than six months, but it may impose a lesser sentence, should it determine, for example, that Underwood accepted responsibility, or decide for other reasons that imposition of the maximum sentence is not warranted. It shall credit against this new sentence the time that Underwood has already served.

The judgment of conviction is

*Affirmed.*

The sentence is vacated and the case is remanded for resentencing in accordance with the instructions set forth in this opinion.

*So Ordered.*

## APPENDIX

### Sentencing Guidelines

**§ 2J1.5.  *Failure to Appear by Material Witness***

(a) Base Offense Level:

(1) **6,** if in respect to a felony;  or

(2) **4,** if in respect to a misdemeanor.

(b) Specific Offense Characteristic

(1) If the offense substantially interfered with the administration of justice, increase by 3 levels.

*Commentary*

*Statutory Provision:* 18 U.S.C. § 3146(b)(2).

*Application Note:*

1. *"Substantially interfered with the administration of justice" includes offense conduct resulting in a premature or improper termination of a felony investigation, an indictment or verdict based upon perjury, false testimony, or other false evidence, or the unnecessary expenditure of substantial governmental or court resources.*

2. *By statute, a term of imprisonment imposed for this offense runs consecutively to any other term of imprisonment imposed.  18 U.S.C. § 3146(b)(2).*

*Background: This section applies to a failure to appear by a material witness. The base offense level incorporates a distinction as to whether the failure to ap-* pear was in respect to a felony or misdemeanor prosecution.  This offense covered by this section is a misdemeanor for which the maximum period of imprisonment authorized by statute is one year.