**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Julio ORTIZ and Manuel Hurtado,**
**Defendants–Appellants.**

Nos. 95–1386, 95–1869.

United States Court of Appeals,
Seventh Circuit.

Argued April 11, 1996.

Decided May 24, 1996.

Matthew L. Jacobs (argued), Thomas P. Schneider, Office of the U.S. Atty., Milwaukee, WI, for the U.S.

David J. Cannon (argued), Michael, Best & Friedrich, Milwaukee, WI, for Julio Ortiz.

Michael J. Edmonds (argued), Milwaukee, WI, for Manuel Hurtado.

Before BAUER, CUDAHY, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Manuel Hurtado and Julio Ortiz were arrested on September 7, 1991, in connection with a distribution of heroin charge. Ortiz, however, was released by the arresting officers shortly after being stopped. Hurtado was less fortunate; he was taken into custody.

Three days after the arrest, on September 10, 1991, Ortiz and Hurtado were charged in an indictment alleging conspiracy to possess heroin with intent to distribute and the actual distribution of 5 ounces of heroin. An arrest warrant was issued for Ortiz, but Hurtado, who was still in custody, immediately faced the music. A few months later, Hurtado pled guilty to the conspiracy charge. He was sentenced to serve a term of 62 months.

Meanwhile, Ortiz remained on the lam until he was apprehended on the outstanding warrant almost three years later in August of 1994. His case proceeded to trial in the fall of 1994 and Hurtado, still serving his sentence, was produced in court to offer testimony on the government's behalf. The government secured an order immunizing Hurtado and compelling his testimony in connection with the prosecution of Ortiz. Hurtado was ordered by the district judge, under 18 U.S.C. § 6002, to answer questions and otherwise provide evidence without asserting his privilege against self-incrimination. After answering a few questions, Hurtado generally refused to talk, and he left the stand without fully complying with the order of the district judge. Although Hurtado did not help the government, he didn't do much good for Ortiz either, as the jury found him guilty of both the conspiracy and substantive heroin charges in the indictment.

With its victory over Ortiz secured, the government again turned its fire on Hurtado by filing an application for notice of prosecution for criminal contempt pursuant to Rule 42(b) of the Federal Rules of Criminal Procedure. The notice sought to bring Hurtado to heel for his disobedience of the court's order to give testimony during Ortiz's trial. The district court entered a notice of prosecution

for criminal contempt and an order to show cause requiring Hurtado to answer the charge and demonstrate why he should not be punished. Hurtado waived his right to a jury trial on the issue and stipulated that the court could enter a finding of criminal contempt under 18 U.S.C. § 401(3). Hurtado was then adjudged guilty of criminal contempt and later he and Ortiz were sentenced, with Ortiz catching a term of 78 months and Hurtado drawing a 37–month term to run consecutive to the time he still owed on the underlying heroin conspiracy conviction. Ortiz and Hurtado both appeal, raising narrow issues for our review. Hurtado only challenges the sentence he received for contempt, and Ortiz only complains about the denial of a motion to suppress evidence seized at the time of his original arrest back in September of 1991. We turn first to the issue raised by Hurtado.

Although the potential for the issuance of a criminal contempt citation lurks in every case, they are not the usual grist of the district court. They are, in fact, rare proceedings indeed, which explains why everyone here—the prosecutor, Hurtado's attorney, and the judge—were a bit uncertain about how the law was to be applied. When Hurtado declined to testify as ordered (he did respond to some questions, and in one answer, much to the delight of the government we suspect, he actually said he knew Julio Ortiz and recognized him in court) he was told he faced the potential of a charge of criminal contempt. Hurtado's lawyer and the prosecutor thought the potential penalty "might be up to six months" but the judge said it could be limitless and that "this type of offense is not governed by the guidelines." Hurtado, a Mexican with a sixth-grade education who didn't speak English (he had an interpreter), was, it appears, totally befuddled.

When Hurtado admitted the charge and consented to the entry of the finding of contempt, he and his lawyer had the following exchange:

Counsel: Manuel, do you remember that the judge told you just a few moments ago that he does not believe that this case is governed by the sentencing guidelines?

Hurtado: Yes.

Counsel: Do you remember me telling you that I disagree with the judge and I believe that this case is governed by the guidelines?

Hurtado: Yes, you told me.

The attorney then told Hurtado that the judge had given him "an opportunity to write a brief in an attempt to convince him that the guidelines apply." Hurtado said "yes" to a question which asked if he understood that there is "no guarantee that I will be able to convince the judge that the guidelines apply."

Hurtado's lawyer must have done some persuasive convincing because two months later, when the case returned to court for sentencing, everyone assumed the guidelines applied. Applying the guidelines resulted in a sentencing range of 37 to 46 months. A 37–month sentence was selected.

The federal sentencing guidelines do not specify a base offense level for criminal contempt. But the guidelines, nevertheless, apply to the charge. This, of course, is not to be confused with summary criminal contempt where a judge may punish quickly a contemptuous act committed in her presence. *See* Rule 42(a) of the Federal Rules of Criminal Procedure. As we noted earlier, the proceedings here were under Rule 42(b).

Chapter 2 of the guidelines, the chapter relating to offense conduct, contains part J, which concerns offenses involving the administration of justice. Section 2J1.1 deals with "contempt," but it's not helpful for it simply says "[a]pply § 2X5.1 (Other Offenses)." Section 2X5.1 tells the sentencing judge that "[i]f the offense is a felony or Class A misdemeanor for which no guideline expressly has been promulgated, apply the most analogous offense guideline." The government and Hurtado part company on the question of what is the "most analogous" offense to Hurtado's conduct of criminal contempt. Hurtado argued that the "most analogous" offense was "Failure to Appear by Material Witness" under § 2J1.5, which carries a base offense level of 6 (a 3–level increase can be ordered if a "substantial interference with the adminis-

tration of justice" occurs) when the failure to appear relates to a felony. The government argued that Hurtado's conduct was an obstruction of justice—in the prosecution of Ortiz—and therefore § 2J1.2 was the most analogous provision. The correct application of § 2J1.2, the government said, required a cross-reference under subsection (c), which provides:

> If the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense. . . .

The base offense level for Accessory After the Fact, § 2X3.1, depends on the offense level for the underlying offense. It says:

> Base Offense Level: 6 levels lower than the offense level for the underlying offense, but in no event less than 4, or more than 30. *Provided*, that where the conduct is limited to harboring a fugitive, the offense level shall not be more than level 20.

The district judge agreed with the government and applied the Accessory After the Fact guideline. He pegged the "underlying offense" as the heroin distribution charge against Ortiz, which carried a base offense level of 26. Hurtado's base offense level then was set 6 levels lower, at 20.

■ The critical question here is whether Hurtado's offense of contempt is more like a failure to appear as a material witness or more like an accessory after the fact. Either offense, in a manner of speaking, is an obstruction of justice as that term is generally understood.

The application note to § 2J1.1 of the guidelines-Contempt—says:

> Because misconduct constituting contempt varies significantly and the nature of the contemptuous conduct, the circumstances under which the contempt was committed, the effect the misconduct had on the administration of justice, and the need to vindicate the authority of the court are highly context-dependent, the Commission has not provided a specific guideline for this offense. In certain cases, the offense conduct will be sufficiently analogous to

§ 2J1.2 (Obstruction of Justice) for that guideline to apply.

The district court looked to U.S.S.G. § 2J1.2, Obstruction of Justice, and opined that "the defendant's conduct did constitute obstruction of justice in the prosecution of a criminal case against Mr. Ortiz." Citing § 2J1.2(c)(1), the district court imposed the sentence pursuant to § 2X3.1 (Accessory After the Fact), stating:

> This is based in part upon the commentary and because the court feels that the conduct of this defendant in this court to which he has entered a plea of guilty was an effort to avoid punishment for an offense that would have and did in fact place the other defendant in a position where he may have escaped punishment but for the credibility of the officers involved.

We think the employment of the accessory after the fact analogy, on the facts of this case, was error. Hurtado's actions at the trial of Ortiz, although somewhat analogous to obstructing justice, is not very close to acting as an accessory after the fact. Failure to Appear by Material Witness, § 2J1.5 of the guidelines, is, we think, a much better fit.

Title 18, U.S.C. § 3, provides that "[w]hoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." Hurtado neither received, relieved, comforted, nor assisted Julio Ortiz. Having been arrested himself, it was impossible for Hurtado to "receive" Ortiz. His post-arrest statements to the police (we'll see what he said when we discuss the motion-to-suppress issue) cannot be said to have provided Ortiz with relief, comfort, or assistance. Actually, the assistance Hurtado provided was entirely to the government, not Ortiz. He gave Ortiz no help whatsoever.

Obstruction of Justice (sec.2J1.2) is not the best guideline either, especially when the whole case is considered. There are no overt acts in the record which indicate that Hurtado intended to obstruct justice, beyond his refusal to testify. Furthermore, there is no evidence that he actually obstructed justice. In this regard, the case is similar to the

situation faced by a district court in *United States v. Herre,* 731 F.Supp. 1051 (S.D.Fla. 1990).

In *Herre,* the defendant was convicted of one count of criminal contempt, pursuant to 18 U.S.C. § 401(3), for refusing to testify, with immunity, before a grand jury as ordered by the court. At sentencing the government contended that U.S.S.G. § 2J1.2, Obstruction of Justice, was the applicable guideline. The defendant argued that U.S.S.G. § 2J1.5, Failure to Appear by a Material Witness, was applicable. The court rejected the government's argument, noting that the only conduct at issue was the defendant's failure to testify. The court placed the burden of proof on the government:

> If the Government believes that the obstruction of justice guideline applies, then it must, at a minimum, point to specific acts by the Defendant resulting in the obstruction of justice, or otherwise show that the Defendant's conduct was designed to interfere with the administration of justice.

*Herre,* 731 F.Supp. at 1053. The court noted that the government had shown neither.

In our case, the only act at issue is Hurtado's refusal to fully testify. It's true he said (through an interpreter) that he didn't "remember" if Ortiz ever sold him anything, but that snippet of testimony was rather inconsequential as was his testimony that he refused to cooperate and meet with the attorney for Mr. Ortiz. All in all, there is nothing to truly indicate that Hurtado's refusal to testify was designed to assist Ortiz in escaping punishment. On the contrary, without Hurtado's statements on the day of his arrest, the government would not have been able to charge Ortiz. Furthermore, Hurtado admitted during his brief appearance on the stand at Ortiz's trial that he was arrested on September 7, 1991, after selling heroin to an undercover federal agent. He identified the agent to whom he had sold the heroin, thus bolstering the agent's testimony. Finally, he indicated he knew Ortiz and identified him for the jury. These statements assisted rather than hindered the prosecution of Ortiz. In sizing up the whole picture, Hurtado did not, at the trial, help convict Ortiz, but he certainly didn't try to help get him acquitted either.

In the one case we have found where a court applied the obstruction of justice guideline to a conviction for contempt, the conduct was much more egregious than Hurtado's here. In *United States v. Remini,* 967 F.2d 754 (2d Cir.1992), the defendant refused to testify, notwithstanding a grant of immunity, at the trial of Thomas Gambino, an organized crime figure from New York. Remini was convicted of contempt in violation of 18 U.S.C. § 401(3). The trial court applied U.S.S.G. § 2J1.2, Obstruction of Justice, and sentenced him to 16 months. On appeal, the defendant argued that the proper guideline was U.S.S.G. § 2J1.5, Failure to Appeal by a Material Witness. The court of appeals rejected the defendant's argument and affirmed the district court.

In rejecting Remini's arguments, the Second Circuit noted that the trial court based its use of the guideline for obstruction on a taped conversation of convicted mob boss John Gotti, who told a third party that he instructed his lawyers to "[g]et my cell ready, get Joe Butch's cell ready; and get Fat Georgie's [Remini's] cell ready. And nobody is taking the stand. Tell them to go fight! Don't worry about it." *Remini,* 967 F.2d at 756. Clearly, Remini intended to obstruct the Gambino trial. He succeeded. The Gambino trial ultimately resulted in an acquittal. Remini's conduct, we think, was far more egregious than Hurtado's, and his sentence—16 months—was 21 months shorter.

Hurtado's case is more analogous to that of the defendant in *United States v. Underwood,* 880 F.2d 612 (1st Cir.1989). Underwood was convicted of contempt under 18 U.S.C. § 402 for his refusal to testify against a codefendant after having been granted immunity. The trial court imposed a 3–year sentence. The First Circuit vacated the sentence and remanded the case, concluding that "there is no applicable sentencing guideline" for contempt and that therefore the "plainly unreasonable" standard of review, 18 U.S.C. § 3742(e)(4), must be employed. *Id.* at 619. By analogizing the situation to the guidelines, however, the First Circuit found that

§ 2J1.5, Failure to Appear by a Material Witness, was a good fit. In declining to employ the obstruction guideline, the court noted that the district court found that the defendant "did not intend to 'obstruct justice;' he simply intended not to testify. In that sense, he intended only to 'fail to appear' as a 'material witness'...." *Id.* at 620.

The same is true of Manuel Hurtado—he did not intend to obstruct justice. He simply did not wish to testify. As noted during his sentencing, Hurtado didn't want to be known as a "snitch or an informer." He wasn't trying to aid Ortiz as an accessory after the fact. His sentencing range should have been set under the Failure to Appear by a Material Witness guideline (sec. 2J1.5). This is not to say that the failure to appear guideline must be used by analogy in all cases involving criminal contempt citations stemming from a failure to testify. In some situations, the use of other guidelines—obstruction of justice and accessory after the fact, to name two—might be better fits. They're not good fits here.

Another reason exists for rejecting accessory after the fact as a good-fit analogy in this case. Its base offense level—a 20 under the guidelines—is seriously out of kilter with Hurtado's offense. A base offense level of 20, for someone without a criminal record, results in a sentencing range of 33–41 months. The mid-point of the range exceeds three years, without parole. That's a mighty stiff sentence to visit on someone who has sinned as Hurtado has. In fact, base offense levels of 20 are used for persons convicted of serious offenses like aggravated assault with serious bodily injury (sec. 2A2.2(b)(3)(B)), theft of more than $5 million (sec. 2B1.1(b)), and the importation of a quarter of a kilo of cocaine (sec. 2D1.1(c)(10)). When compared to these transgressions, Hurtado's decision to clam up seems fairly tame. For these reasons, Hurtado must be resentenced.

The last issue, unfortunately for Ortiz who raises it, has little merit. To frame the issue, we return (very briefly) to September 7, 1991, the day Hurtado and Ortiz were arrested.

As part of an undercover operation, police (actually the DEA and the Bureau of Alcohol, Tobacco and Firearms) purchased a small sample of heroin from Hurtado. The purchase of additional, larger quantities of heroin was discussed. Hurtado said he had a new source of supply in Chicago, and he agreed to make a transfer to the undercover agents on September 7 in the parking lot of a Shell gas station in Racine, Wisconsin. During this transaction, Hurtado supplied the agents with five ounces of heroin. Hurtado was arrested and immediately agreed to cooperate in the investigation. He identified his source of supply as a Mexican fellow from Illinois known to him as "Julio." He gave the agents Julio's electronic pager number, which reflected a Chicago-area telephone number. He also gave the agents a physical description of Julio and they began calling the pager number, eventually making a connection. Hurtado, at the agents' request, spoke with "Julio" and arranged a meeting to obtain more heroin. The meeting was to take place later that day in the parking lot of a McDonald's restaurant in the Chicago area. Hurtado stated that Julio would be driving a blue Buick and that the meeting would take place in approximately an hour and a half.

Based on this information the agents traveled to the parking lot near Chicago and soon observed a blue Buick driven by a man matching the description of "Julio." According to the agents, the driver of the automobile drove around the parking lot two or three times, left the parking lot, and then drove around a second parking lot. With the assistance of deputies from the Cook County sheriff's department, the Buick was stopped and the driver was asked if he was "Julio." The driver, who of course turned out to be Julio Ortiz, said yes.

The officers asked Ortiz to get out of the car and patted him down for weapons. Ortiz was then placed in handcuffs and moved to the front of his vehicle. At the front of the car, the agents searched Ortiz and found an electronic pager, which was seized. While looking for drugs in the car, the officers pried open two concealed compartments in the rear area of the vehicle, and inside one they found a loaded .25 caliber Beretta pistol.

After the gun was found, one of the agents noticed that Ortiz's wristwatch was also an electronic data bank capable of storing telephone numbers. The agent recognized this function of the watch because he owned a similar electronic telephone directory. The agents removed the wristwatch/electronic telephone directory from Ortiz's wrist and retained it as evidence.

While still at the parking lot, one of the agents pushed a button on Ortiz's digital pager, which revealed the numeric messages previously transmitted to the pager. Among the digital messages recovered was the telephone number of the phone at the Shell gas station in Racine where the agents called the pager number provided by Hurtado.

Although collecting and seizing various items from Ortiz and his vehicle, things like the electronic pager, the wristwatch/electronic telephone directory, and the Beretta pistol with two loaded ammunition magazines, the agents didn't find any heroin so Ortiz was released from custody. The following day, the agents retrieved various telephone numbers stored in Ortiz's wristwatch.

After his arrest, Ortiz filed a motion to suppress everything seized from his person and vehicle. Magistrate Judge Goodstein held an evidentiary hearing on the motion and recommended to the district court that the motion be denied, except for the retrieval of information from Ortiz's watch, which was not seized until the next day. The district court adopted the recommendation.

 We review the denial of a motion to suppress for clear error. *United States v. Patterson*, 65 F.3d 68, 70 (7th Cir.1995). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id.* The district court here did not clearly err in denying Ortiz's suppression motions: the search of the vehicle was conducted pursuant to the automobile exception to the warrant requirement, and the information from the pager was properly seized incident to a valid arrest.

 Under the "automobile exception" to the warrant requirement of the Fourth Amendment, law enforcement officers may search an automobile without a warrant when they have probable cause to believe that the vehicle contains contraband or evidence of criminality. *Chambers v. Maroney*, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981–82, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 153–56, 45 S.Ct. 280, 285–86, 69 L.Ed. 543 (1925); *Patterson*, 65 F.3d at 70. The scope of the search may "extend[ ] to all parts of the vehicle in which contraband or evidence could be concealed, including closed compartments and trunks." *United States v. Young*, 38 F.3d 338, 340 (7th Cir.1994).

In this case, the magistrate judge found that the search of Ortiz and his Buick was legal because the officers clearly had probable cause to believe he was a heroin supplier and had driven to the McDonald's to conduct a drug transaction. Because the search was based on probable cause, the scope of the search could extend to any part of the vehicle capable of concealing narcotics or other evidence of drug dealing, including the hidden compartment from which the officers seized the pistol (and some ammunition).

Ortiz's very able counsel on appeal contends that the district court clearly erred in denying the motion to suppress the pistol because, at the time of the search, it was not within his "wingspan" and no exigency existed which vitiated the necessity of obtaining a search warrant. We cannot accept this claim.

Ortiz's argument tries to tiptoe past the automobile exception to the Fourth Amendment's warrant requirement. The "wingspan" argument would only be applicable if the officers lacked probable cause to believe Ortiz's Buick contained drugs. *See, e.g., United States v. Evans*, 994 F.2d 317, 322 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 335, 126 L.Ed.2d 280 (1993). Under the automobile exception to the Fourth Amendment's warrant requirement, the district court's denial of the motion to suppress the pistol was not clearly erroneous.

Ortiz also argues that the district court clearly erred by refusing to suppress information the officers retrieved from the pager. He says the analysis applied by the magis-

trate judge to recommend suppressing the information retrieved from the wristwatch should have been applied to the information retrieved from the pager. But the information from the pager was admissible because the officers conducted the search of its contents incident to the arrest. The magistrate judge applied a different analysis to the information from the wristwatch because it was not retrieved "contemporaneous with Ortiz's arrest."

While few reported decisions have addressed this issue, the court's decision allowing the activation of the pager and retrieval of the information incident to arrest is consistent with established Fourth Amendment precedent.

In *United States v. Chan*, 830 F.Supp. 531, 533 (N.D.Cal.1993), DEA agents seized a pager from the defendant at the time of arrest and searched its contents by activating its memory and retrieving telephone numbers. The defendant argued that activation of the pager was a search requiring a warrant because the pager was a container as to which he had a reasonable expectation of privacy. *Id.* The court found that the possessor of a pager has an expectation of privacy in the data contained therein in the same manner as an individual in possession of a closed container. *Id.* at 534–535. The court ruled, however, that the search of the pager was legal under cases which permit the search of containers found on or near the arrestee in a search incident to arrest. *See New York v. Belton*, 453 U.S. 454, 461, 101 S.Ct. 2860,. 2864–65, 69 L.Ed.2d 768 (1981).

The defendant in *Chan* also argued that under *United States v. Chadwick*, 433 U.S. 1, 12–13, 97 S.Ct. 2476, 2484–85, 53 L.Ed.2d 538 (1977), a warrant is required to search the contents of closed containers when an individual has a heightened expectation of privacy in its contents. The *Chan* court appropriately recognized that *Chadwick*'s protections are not so broad:

> The Court in *Chadwick* adopted a narrow exception to the incident to arrest doctrine, holding that a warrantless search of seized property cannot be justified when the search is remote in time or place from the arrest. *Chadwick*, 433 U.S. at 13–15, 97

S.Ct. at 2485. As the Supreme Court explains:

> Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

*Chan*, 830 F.Supp. at 535. *Chan* found that the retrieval of telephone numbers from a pager's memory immediately upon arrest is not so "remote" from the arrest that it falls within the exception of *Chadwick*. *Id.* We agree with this analysis.

An officer's need to preserve evidence is an important law enforcement component of the rationale for permitting a search of a suspect incident to a valid arrest. *See United States v. Robinson*, 414 U.S. 218, 226, 234–35, 94 S.Ct. 467, 472–73, 38 L.Ed.2d 427 (1973). Because of the finite nature of a pager's electronic memory, incoming pages may destroy currently stored telephone numbers in a pager's memory. The contents of some pagers also can be destroyed merely by turning off the power or touching a button. *See, e.g., United States v. Meriwether*, 917 F.2d 955, 957 (6th Cir.1990). Thus, it is imperative that law enforcement officers have the authority to immediately "search" or retrieve, incident to a valid arrest, information from a pager in order to prevent its destruction as evidence. The motion to suppress was properly denied.

For these reasons, the conviction of Ortiz is affirmed and the sentence of Hurtado is vacated. Hurtado's case is remanded to the district court where he should be resentenced consistent with this opinion.