**UNITED STATES of America, Plaintiff,**

v.

**Thomas RYAN, Defendant.**

**Criminal Action No. 96–10128–NG.**

United States District Court,
D. Massachusetts.

March 28, 1997.

---

Bernard Grossberg, Boston, MA, Joseph J. Balliro, Jr., Balliro & Mondano, Boston, MA, for Defendant.

Fred M. Wyshak, Jr., U.S. Attorney's Office, Strike Force, Boston, MA, James D. Herbert, U.S. Attorney, Strike Force, Boston, MA, Brian T. Kelly, U.S. Attorney's Office, Strike Force Division, Criminal, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

### I. INTRODUCTION

Thomas Ryan was subpoenaed by a grand jury to appear as a witness in an investigation of Francis P. Salemme ("Salemme") and others associated with the so-called Winter Hill Gang, a Boston area organized crime group.

Notwithstanding a grant of immunity pursuant to 18 U.S.C. § 6003, Ryan refused to testify. He was held in civil contempt by the U.S. District Court, Judge Robert E. Keeton, for which he spent sixteen months in prison.

On May 7, 1996, a one-count indictment was returned in the U.S. District Court in Boston, charging Ryan with criminal contempt. The indictment alleged that on or about May 20, 1993, and September 12, 1994, the defendant unlawfully, knowingly, and intentionally disobeyed the order issued by Judge Keeton compelling him to testify before a grand jury in violation of 18 U.S.C. § 401(3). On November 6, 1996, the defendant was found guilty.[1]

The sentencing guidelines, recognizing that the offense of contempt is fact specific, make no effort to prescribe a specific offense level. Rather they direct the Court to the guideline which the Court determines, under all the circumstances, to be the most analogous to the defendant's offense. This question—the most analogous guideline—is the central issue in the sentencing of Mr. Ryan.

### II. ANALYSIS

The starting point of analysis is U.S.S.G. § 2J1.1 (Contempt), which directs a court to what can only be described as the miscellaneous guideline, § 2X5.1, labelled "Other Offenses." Section 2X5.1 calls for the application of the guideline most analogous to the defendant's offense.[2] The application note to § 2J1.1 explains why contempt is treated in this fashion:

> Because misconduct constituting contempt varies significantly and the nature of the contemptuous conduct, the circumstances under which the contempt was committed, the effect the misconduct had on the administration of justice, and the need to vindicate the authority of the court are highly context-dependent, the Commission has not provided a specific guideline for this offense.[3]

### A. The Case Law Framing The Most Analogous Offense

The case law describes a continuum for evaluating the range of "contemptuous conduct" covered by 18 U.S.C. § 401: At one end is obstruction of justice (§ 2J1.2); at the other is failure to appear as a material witness (§ 2J1.5); in the middle is misprision of a felony (§ 2X4.1).

---

**1.** A bench trial was held on October 16, 1996, at which Ryan stipulated to all material facts. Ryan's sole purpose in exercising his right to trial was to preserve certain constitutional claims. Ryan alleged that the criminal contempt prosecution following a civil contempt finding and imprisonment violated his rights under the Double Jeopardy Clause of the Constitution. These claims were rejected in a decision dated November 6, 1996.

**2.** § 2X5.1 provides in pertinent part:
If the offense is a felony or Class A misdemeanor for which no guideline expressly has been promulgated, apply the most analogous offense guideline.

**3.** U.S.S.G. § 2X5.1 provides that if there is no sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b) shall control. Section 3553(b) requires that "the court ... impose an appropriate sentence, having due regard for the purposes set forth in subsection (a)(2)" which includes "the need for the sentence to be imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant ..."

The continuum is defined by the defendant's conduct and his intent. On the least culpable end is the defendant who acted in good faith; this could include a defendant who may have feared reprisals, and who, consequently, did not intend to obstruct justice. *See United States v. Underwood,* 880 F.2d 612, 620 (1st Cir.1989) (applying the failure to appear as a material witness sentencing guideline). At the other end is a defendant who not only intended to avoid testifying, but who also sought in bad faith to interfere with an ongoing investigation or prosecution. *See United States v. Remini,* 967 F.2d 754 (2d Cir.1992) (applying the obstruction of justice sentencing guideline). In between is the defendant who simply refuses to testify without providing a reason for his refusal. *See United States v. Cefalu,* 85 F.3d 964 (2d Cir.1996) (applying the misprision of a felony sentencing guideline).[4]

### 1. *Underwood and Failure to Appear by a Material Witness*

Not surprisingly, the defendant argues that Underwood should be the template for my analysis. In *Underwood,* 880 F.2d 612, 620 (1989), the First Circuit held that the defendant's refusal to testify despite his grant of immunity may constitute failure to appear by material witness, and not obstruction of justice, where there was evidence the defendant was motivated by a good faith reason. The defendant in *Underwood* feared that his testimony before the district court, even if immunized, would bear first on the same court's decision to accept his plea

agreement, and then on his sentencing. *Id.* at 615. In that case, the First Circuit reasoned that the obstruction of justice guideline was inapplicable. The defendant did not intend to obstruct justice; he "simply intended not to testify."[5] *Id.* at 620.

### 2. *Remini and Obstruction of Justice*

The government contends that the offense most analogous to Ryan's contempt charge is obstruction of justice under the "omnibus clause" of 18 U.S.C. § 1503,[6] as the Second Circuit found in *Remini,* 967 F.2d 754 (1992). In *Remini,* facing entirely different facts than faced the court in *Underwood,* the Second Circuit declined to follow the First Circuit's holding. Remini was given immunity and ordered to testify in the prosecution of Thomas Gambino. *Id.* at 755. The defendant refused, and was prosecuted for contempt. In sentencing Remini, the court applied § 2J1.2 (obstruction of justice) after determining that "[t]here was an intent to obstruct justice" and not merely an intent not to testify. *Id.* at 756. *Compare Cefalu,* 85 F.3d 964, 967 (2d Cir.1996); *Underwood,* 880 F.2d at 620. The court made this determination after hearing a taped conversation in which John Gotti (a Gambino crime family leader) told a third party that he had instructed his lawyers to "get ... [Remini's] cell ready. And nobody is taking the stand." *Remini,* 967 F.2d at 756. The district court specifically found that "the electronic intercepted conversations between John Gotti and

---

4. There is a parallel to wartime offenses. On one end is a conscientious objector who chooses not to participate in a war. On the other is someone who affirmatively tries to disrupt the war effort. In between is someone who simply declines to participate.

5. *See also United States v. Ortiz,* 84 F.3d 977 (7th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 250, 136 L.Ed.2d 177 (1996). In *Ortiz,* the court followed *Underwood* in upholding a sentence imposed by the district court pursuant to § 2J1.5 (failure to appear by material witness). The court reasoned that although the defendant Hurtado's refusal to testify despite a grant of immunity was somewhat *analogous* to obstruction of justice, failure to appear by material witness was "a much better fit" because there were *"no overt acts in the record which indicate that Hurtado intended to obstruct justice. beyond his refusal to*

testify." *Id.* at 980 (emphasis added). The court noted that, like Underwood, Hurtado "did not intend to obstruct justice. He simply did not wish to testify. As noted during his sentencing, Hurtado didn't want to be known as a 'snitch or an informer.'" *Id.* at 982. In effect, the court in *Ortiz* sought to extend Underwood to what I have described as the intermediate category—the failure to testify without a good faith basis. I do not believe the First Circuit's decision in Underwood can be stretched that far, to make failure to appear as a material witness the most analogous category absent any good faith basis for the defendant's conduct.

6. 18 U.S.C. § 1503 states in relevant part:

Whoever corruptly, ... endeavors to influence, obstruct, or impede, the due administration of justice, ... shall be guilty of an offense against the United States.

Mr. Remini indicated a lack of good faith on the part of Mr. Remini." *Id.*

### 3. *Cefalu and Misprision of a Felony*

In *Cefalu,* 85 F.3d 964 (2d Cir.1996), the court distinguished both *Remini* and *Underwood* and sentenced the defendant under § 2X4.1 (misprision of felony). *See also United States v. Versaglio,* 96 F.3d 637 (2d Cir.1996) (same). The defendant, without explanation,[7] refused to testify against a member of the Gambino crime family despite his grant of immunity. *Cefalu,* 85 F.3d at 965. Turning first to *Underwood* and *Remini,* the court looked to whether the defendant acted in good faith or bad faith. The court determined that Cefalu, unlike Underwood, did not have a "good faith belief that there was a legal basis for refusing to answer." *Id.* at 967. That finding, however, did not mean that § 2J1.2 (obstruction of justice) must be applied.

As in *Underwood,* the district court was persuaded that the obstruction of justice guideline was not "sufficiently analogous because the examples provided in the obstruction guideline deal with affirmative acts of wrongdoing, indicating that something more than the mere failure to answer a question may be required."[8] *Cefalu,* 85 F.3d at 967. At the same time, however, the court found that the offense of failure to appear by material witness was also not sufficiently applicable "because it did not address the seriousness of the crime being prosecuted in the [underlying organized crime] case." *Id.* at 966. Accordingly, the court determined that misprision of felony was more analogous than any other guideline. Misprision of felony, "though not a perfect fit, was similar because it addresses the defendant's withholding information concerning a crime." *Id.* at 969.

### 4. *The Facts in the Case At Bar*

In the case at bar, I agree with the court in *Cefalu* that misprision of a felony is the most analogous offense. Indeed, the facts here and in *Cefalu* are nearly indistinguishable. Both defendants refused to testify in spite of a grant of immunity and a judicial order.[9] Further, neither defendant offered any affirmative explanation for his refusal to testify. *See Cefalu,* 85 F.3d at 967. In the absence of any affirmative showing of a good faith belief that he was not lawfully required to testify, or even a good faith belief that his life was in jeopardy, the *Underwood* analysis is inapplicable. The sentencing guideline for failure to appear by material witness is thus inappropriate. *Compare Underwood,* 880 F.2d at 620.

Nor is there any evidence on the other side—of affirmative bad faith or bad acts on the part of the defendant comparable to those highlighted by the court in *Remini.* The government produced audio surveillance tapes of the defendant discussing what appears to be bookmaking activities with George Kaufman, a member of the so-called Winter Hill Gang. Kaufman collected extortion payments from bookmakers and loan sharks for James J. Bulger and Stephen Flemmi, of the Winter Hill Gang. Indictment in *United States v. Salemme,* 94–10278–MLW. While these tapes show that Ryan may have been involved with some of the organized crime activities in the underlying indictment itself, they do not constitute the kinds of admissions found in *Remini.* There is no "overt act" by Ryan designed to help Salemme and the defendants in the underlying RICO case.

Indeed, the government seeks to characterize Ryan in these proceedings in a fashion wholly at odds with the way he is characterized in the Salemme indictment. In the in-

---

7. "There was some concern that Cefalu refused to testify out of fear of reprisal. The court thought it unlikely that the defendant would spend eighteen months in jail for civil contempt, followed by a criminal contempt charge and sentence for criminal contempt, if he did not believe that testifying would put him in serious physical danger ..." *Cefalu,* 85 F.3d at 967 n. 5.

8. In summarizing the conduct which may constitute obstruction of justice, the Guideline states:

"The conduct that gives rise to the violation may, therefore, range from a mere threat to an act of extreme violence." U.S.S.G. 2J1.2, comment. (backg'd). Failure to testify is nowhere mentioned in this section.

9. The criminal contempt charge against Cefalu stemmed from his refusal to testify at trial, while Ryan's conviction stems from his refusal to testify before the grand jury.

dictment, Ryan, like the other bookmakers extorted by the Winter Hill Gang, is characterized as a victim, threatened and coerced into paying protection money—known as "rent"—to the Winter Hill Gang. *See* ¶¶ lg, 6, 13, 24, 31, *Id.*[10] According to that picture, it would not be unreasonable for him to fear reprisals if he testified. At sentencing, however, the government suggested that Ryan was a more central player in the general scheme, that he had expressly chosen not to testify in order to undermine the Salemme investigation and protect his own livelihood.

■ On the facts presented before me, the evidence is in equipoise. Moreover, since the government has the burden of proving that Ryan has the requisite intent necessary to establish obstruction of justice, I cannot so find.[11]

■ While it is not a perfect fit, misprision of felony is the most analogous offense given the facts and circumstances here presented. The elements of misprision of felony are: (1) the principal committed and completed the alleged felony; (2) the defendant had full knowledge of that fact; (3) the defendant failed to notify the authorities; and, (4) the defendant took steps to conceal the crime. *Cefalu,* 85 F.3d at 969 (citing *United States v. Ciambrone,* 750 F.2d 1416, 1417 (9th Cir. 1984); *United States v. Baez,* 732 F.2d 780, 782 (10th Cir.1984)).[12]

■ The evidence suggests that Ryan had knowledge of the defendants' criminal conduct, and yet refused to convey that information to the Court, when ordered to do so. As in *Cefalu,* the elements of "failure to notify"

and "attempt to conceal" are met by the defendant's persistent refusal to testify. Therefore, I find that § 2X4.1 is the appropriate sentencing guideline to be applied.

### B. *Enhancements*

The misprision guideline, § 2X4.1, defines its base offense level as follows: "9 levels lower than the offense level for the underlying offense, but in no event less than 4, or more than 19." The Application Note (Note 1), defines "underlying offense" as "the offense as to which the defendant is convicted of committing the misprision." Moreover, it directs the court to adjust the base offense level to reflect "any applicable specific offense characteristics that were known, or reasonably should have been known, by the defendant." (citing specifically to Application Note 10 of the Commentary to § 1B1.3 (Relevant Conduct)).

#### 1. *The Underlying Offense*

■ The underlying offense—the Salemme RICO prosecution—has a base offense level of eighteen. U.S.S.G. § 2B3.2. I will add two levels to the underlying offense because it involved the express or implied threat of death, bodily injury or kidnapping, a fact that reasonably should have been known by Ryan since he was allegedly a victim of it. U.S.S.G. § 2B3.2(b)(1). I will not, however, add the four additional levels sought by the government on the grounds that the amount of money extorted from the victims of the RICO scheme exceeded $800,-000. U.S.S.G. § 2B3.2(b)(2). $800,000 is the total of all monies extorted from all victims,

---

10. See especially ¶ 31, which states:

From in or before May 1991 through in or after December 1991, the defendants JAMES J. BULGER and STEPHEN J. FLEMMI ... including GEORGE KAUFMAN, did knowingly and unlawfully obtain property, to wit, United States currency from Thomas Ryan who was engaged in illegal gambling activity, with his consent, which consent was induced by the wrongful use of actual or threatened, force, violence, and fear, including indirect threats of physical harm, property damage and economic loss....

11. In *United States v. Herre,* 731 F.Supp. 1051, 1053 (S.D.Fla.1990), the court placed the burden of proof on the government. "If the Government

believes that the obstruction of justice guideline applies, then it must, at a minimum, point to specific acts by the Defendant resulting in the obstruction of justice, or otherwise show that the Defendant's conduct was designed to interfere with the administration of justice." *Id.*

12. The statutory provision for misprision of felony, 18 U.S.C. § 4, states:

Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined not more than $500 or imprisoned not more than three years, or both.

not the amount obtained from any one victim. I am obliged to enhance the base offense level only to the extent that I find facts which "the defendant knew or should have known." There is insufficient evidence from which to conclude that Ryan had actual knowledge or reason to have known the extent to which individual victims of the extortion being investigated had experienced financial loss.

Thus, the offense level for the underlying offense is twenty.

■ The government also seeks an enhancement under § 2X3.1 [13] (accessory after the fact), as cross-referenced by § 2J1.2 (c)(1), or in the alternative, under § 2J1.2(b)(2) (substantial interference with the administration of justice). Both of these enhancements presume that the applicable guideline is § 2J1.2 (obstruction of justice). Because I find that the most analogous offense in this case is § 2X4.1 (misprision of felony), the enhancements referred to in § 2J1.2 are inapplicable. Even if the obstruction of justice guideline were to be followed, however, application of the accessory after the fact enhancement is not appropriate in this case. There is no evidence that Ryan received, relieved, comforted or assisted the defendants in the underlying RICO offenses. *See Ortiz,* 84 F.3d at 980. Further, there is no evidence that his refusal constituted an effort to hinder or prevent the apprehension, trial or punishment of the RICO defendants. *Id.* The record shows only that Ryan refused to testify.

### 2. *The Claim that Criminal History Category I Understates Ryan's Criminal History*

■ The government also seeks an upward departure in Ryan's criminal history category to at least category III. U.S.S.G. § 4A1.3. In so arguing, the government relies upon *United States v. Hardy,* 99 F.3d 1242, 1250–51 (1st Cir.1996), where the court noted that § 4A1.3 "specifically encourages upward departures based on 'reliable infor-

mation' that a defendant previously engaged in 'prior similar adult criminal conduct not resulting in a conviction.' "

I will not make an upward departure by increasing Ryan's criminal history category. The government is in effect attempting an end run around the immunity order it imposed upon Ryan, punishing him now for the offense of participating in bookmaking activities.

Further, the government's reliance on *Hardy* is misplaced. Evidence of Ryan's uncharged criminal history is far too speculative to support an upward departure. In *Hardy,* the district court made an upward departure pursuant to § 4A1.3 based upon two state convictions for assault and battery that had been subsequently vacated by the state court. *Id.* The court also relied heavily on an unchallenged statement in the presentencing report that the defendant had kicked his girlfriend and thrown her off a third floor balcony. *Id.* at 1251. Finally, the court found an upward departure was warranted because the defendant committed the offense in question while on probation for a prior drug conviction and on bail for pending firearms charges. *Id. See also United States v. Fahm,* 13 F.3d 447, 451–52 (1st Cir.1994) (finding upward departure warranted where defendant committed crime while on probation, defendant committed numerous serious prior crimes for which he received lenient sentences, and younger defendant poses greater risk of recidivism than an older defendant).

In Ryan's case, the government has not offered any additional prior convictions, vacated or otherwise, to justify an upward departure. At the time of his contemptuous conduct, Ryan was not on probation or bail for another offense. *See Fahm,* 13 F.3d at 452. There is no indication that he had ever been charged for any other offenses.

The government seeks an upward departure based solely upon its speculation that Ryan has lived a life of crime as a bookmaker

---

13. Under 18 U.S.C. § 3, an accessory after the fact is defined as "[w]hoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact."

and somehow, after 66 years, escaped apprehension. While both parties agree that Ryan has been a bookmaker, no details are provided. In the absence of such facts grounding this request for an upward departure, I **DENY** the government's request.

### 3. *Acceptance of Responsibility*

██ Both parties agree that Ryan is entitled to a deduction of two levels on the grounds of Acceptance of Responsibility. U.S.S.G. § 3E1.1(a). In determining whether a defendant qualifies for such a departure, the court should consider, inter alia, whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction." U.S.S.G. § 3E1.1, comment. (n.1). Ryan stipulated to the facts underlying the contempt offense and exercised his right to trial solely for the purpose of raising an important double jeopardy issue. A downward departure is, therefore, appropriate in these circumstances.

### C. *The Guideline Computation*

Ryan refused to testify in reference to a RICO violation (extortion) which has a base offense level of *eighteen*. U.S.S.G. § 2B3.2. Two levels are added to the underlying offense because it involved an expressed or implied threat of death, bodily injury or kidnapping. U.S.S.G. § 2B3.2(b)(1). Thus, the Total Offense Level for the underlying offense is *twenty*. The relevant guideline provision for misprision of felony, U.S.S.G. § 2X4.1, states that the base offense level is nine levels lower than the offense level for the underlying offense, but not less than four and not more than nineteen. After subtracting nine levels in accordance with the misprision of felony sentencing guideline, the resulting offense level is eleven. An additional two levels are subtracted for acceptance of responsibility, resulting in a total offense level of *nine*. U.S.S.G. § 3E1.1(a), and a criminal total offense level of *nine*, U.S.S.G. § 3E1.1(a), and a criminal history category of I.

### D. *The Sentence*

On March 17, 1997, I sentenced Mr. Ryan to a sentence of ten months, five of which were to be served in community confinement and five in home detention. I was later informed that that was an improper sentence. The Bureau of Prisons could not impose a term of home confinement beyond 10% of Mr. Ryan's total sentence, or in this case, one month.

Accordingly, Mr. Ryan will be resentenced to the following term: A period of five months community confinement in the custody of the Bureau of Prisons with a judicial recommendation that the defendant serve his sentence in custody at the Coolidge House facility in Boston, Massachusetts. This sentence is to be followed by five months supervised release with a special condition, in addition to the statutory conditions, that the defendant be under home confinement without electronic monitoring, and that the defendant be prohibited from possessing a firearm or other dangerous weapon.

**SO ORDERED.**