**UNITED STATES of America, Appellee,**

v.

**Robert Hugh BRADY, Defendant, Appellant.**

**No. 98–1561.**

United States Court of Appeals, First Circuit.

Heard Jan. 7, 1999.

Decided Feb. 26, 1999.

---

Leo T. Sorokin, Federal Defender Office, for appellant.

Ben T. Clements, Assistant U.S. Attorney, with whom Donald K. Stern, United States Attorney, was on brief for the United States.

Before BOUDIN, Circuit Judge, COFFIN, Senior Circuit Judge, and LYNCH, Circuit Judge.

BOUDIN, Circuit Judge.

Because this appeal involves sentencing issues following a guilty plea, we take the background facts from the presentence report that followed Robert Brady's conviction for criminal contempt. *See United States v. Gill,* 99 F.3d 484, 485 (1st Cir.1996). According to the presentence report, Brady and two close friends traveled in late July 1996 to Boston's North End from nearby Charlestown. The two friends, Brendan Brennan and Paul Hansen, then stole a minivan; at about the same time, Brady stole a Pontiac Bonneville parked several blocks away from the minivan.

Brennan and Hansen had previously agreed to steal a vehicle for use by other Charlestown men in a planned robbery of an armored car (Brady's involvement *vel non* is a separate matter discussed below). On July 31, 1996, three masked men used the stolen van to rob an armored car in a shopping plaza in Somerville, Massachusetts. In the course of the robbery, one of the robbers deliberately shot and killed one of the guards. Federal authorities began an investigation.

In the fall of 1996, Brady was photographed and fingerprinted as part of the FBI's investigation of the robbery; in connection with this investigation, Brady made statements more or less admitting that he had stolen the Bonneville. In March 1997, Brady was summoned before the federal grand jury investigating the robbery, and he took the Fifth Amendment; subsequently, Brady was made the subject of an immunity order compelling him to testify and providing that information he gave could not be used against him. *See* 18 U.S.C. § 6002.

When Brady refused to testify despite the immunity order, U.S. District Judge Saris held him in civil contempt and jailed him until October 24, 1997, when the grand jury expired without returning indictments against the robbers. At various times, the government offered Brady protection against reprisal, but he still declined to testify. Brady never suggested that he was concerned about reprisals and affirmatively rejected the suggestion on one occasion; he did say at least once that he intended not to "rat" on anyone. On September 17, 1997, Brady was indicted for criminal contempt for refusing to testify. *See* 18 U.S.C. § 401(3).

On January 30, 1998, Brady pled guilty to criminal contempt before U.S. District Judge Young. On two different occasions, both before and after the plea, Brady expressed a willingness to testify if different conditions were met; one condition (that no prior interview or proffer be required) was agreed to, but the other (a promise that Brady would not be prosecuted for perjury if he lied) was naturally rejected. After postponing sentencing to allow further negotiations, Judge Young held a final sentencing hearing on April 21, 1998.

As we shall explain in more detail, the sentencing guidelines provide that for criminal contempt, the court should adopt the guideline for the most analogous criminal conduct. The presentence report, which Judge Young adopted, recommended that Brady be sentenced under the sentencing guideline that applies to obstruction of justice, U.S.S.G. § 2J1.2. The obstruction guideline provides that where the obstruction interferes with a criminal investigation, the offense level to be adopted is taken from the guideline for the offense of accessory after the fact. *See id.* § 2J1.2(c)(1).

In the course of sentencing, Judge Young found that Brady had been "involved" with Brennan and Hansen, that he knew of their plans, and that Brady's theft of the Bonneville was "in some way" related to the robbery. Accordingly, he employed the offense level set forth in the accessory-after-the-fact guideline, U.S.S.G. § 2X3.1, which increases the offense level (up to a maximum of 30) based on the underlying criminal conduct— here, a robbery and murder. After an adjustment for acceptance of responsibility, Brady's offense level was found to be 27. The district court sentenced Brady to the

maximum amount permitted by the guidelines—87 months—and Brady now appeals.

On this appeal, Brady quarrels with the district court's choice of guidelines, with its legal analysis, and with its findings. In response, the government invokes our own recent decision in *United States v. Marquardo*, 149 F.3d 36 (1st Cir.1998), upholding use of the obstruction guideline in somewhat similar circumstances. This case presents several issues that recur in obstruction-related matters against a backdrop of confusing case law; whether we can do much to clarify the case law remains to be seen.

Under the guidelines, the offense of criminal contempt embraces misconduct so varied in type and context that "the Commission has not provided a specific guideline for this offense." U.S.S.G. § 2J1.1 app. note (1). Instead, the Commission in section 2J1.1 directs the court by cross reference to "apply the most analogous offense guideline," U.S.S.G. § 2X5.1 (Other Offenses), while noting in section 2J1.1 app. note (1) that in some cases the best analogy may be to U.S.S.G. § 2J1.2, the obstruction of justice guideline. *See United States v. Ryan*, 964 F.Supp. 526, 528 (D.Mass.1997).

Brady argues that the choice of analogies is a question of law, subject to *de novo* review. *See United States v. Hornsby*, 88 F.3d 336, 338 (5th Cir.1996). *Marquardo*, by contrast, said that the district court enjoyed some latitude in its choice, especially where factual issues were involved. *See* 149 F.3d at 45. The truth is that the choice of an analogy can involve different *kinds* of questions: abstract legal questions reviewed *de novo*, raw issues of fact reviewed under the clearly erroneous standard, and issues of law application (applying abstract standards to particular facts) where deference is common but not invariable. *See Sierra Fria Corp. v. Donald J. Evans, P.C.*, 127 F.3d 175, 181 (1st Cir.1997); *see also United States v. Cefalu*, 85 F.3d 964, 966 (2d Cir.1996).

■ Where the contempt is a refusal to testify before a grand jury, courts have resorted to several different guidelines as analogies, including the obstruction guideline, the misprision guideline, and the guideline governing the refusal of a material witness to

appear. *See Ryan*, 964 F.Supp. at 528–30. No one of these is the "right" answer as a matter of law for all cases of refusal to testify; rather, the choice of the best analogy is likely to depend in part on the circumstances. *See Cefalu*, 85 F.3d at 966–68 & n. 6. Once the circumstances are determined, the district court's choice of an analogy should be upheld if it is reasonable. *See Marquardo*, 149 F.3d at 45; *Cefalu*, 85 F.3d at 968.

"Reasonableness" in this context means that the defendant's conduct (including state of mind) is closely similar to conduct that would constitute the crime set forth in the more specific guideline selected as the analogy. Similarity, not identity, is what is required for an analogy, and similarity does involve judgment. Thus, some latitude for the district court on this judgment call seems appropriate, but it is not unlimited. Either side may still argue on appeal that the similarity is *far* too slight or that there is *manifestly* a better analogy.

■ Here, the district court chose as the analogy the "obstruction of justice" guideline. Our presumption is that the Commission intended the quoted phrase to have the same meaning as the crime defined in 18 U.S.C. § 1503, which is cross-referenced by the guideline, U.S.S.G. § 2J1.2, comment. (statutory provisions), and we see nothing to rebut the presumption. The elements of the obstruction offense—purely an issue of law—are defined by the statute and interpretive case law.

The pertinent statutory language is as follows:

> Whoever ... corruptly ... influences, obstructs, or impedes, or endeavors to influence, obstruct or impede, the due administration of justice shall be punished as provided in [18 U.S.C. § 1503(b) ].

18 U.S.C. § 1503(a).

■ It is settled by case law that "the due administration of justice" includes the operation of the grand jury, and that depriving the grand jury of information may constitute obstruction under the statute. *See, e.g., United States v. Banks*, 942 F.2d 1576, 1578 (11th

Cir.1991); *United States v. Cintolo*, 818 F.2d 980, 990 (1st Cir.1987). Here, we think it was a fair inference that Brady possessed some information that could assist the grand jury; this is suggested by his association on the night of the minivan robbery with two friends who stole the van used in the robbery and by Brady's refusal to testify, which (given the immunity order and absent a showing of actual fear) suggests that he knew something useful. In all events the district court thought that Brady had useful information and, as we will see, this view is not clearly erroneous.

■ The robbery grand jury may well have been obstructed given that it was initially unable to indict, but actual obstruction is not needed if the defendant "endeavors" to obstruct. 18 U.S.C. § 1503(a). "Endeavors" suggests both a purpose to obstruct and some step in that direction. *United States v. Tedesco*, 635 F.2d 902, 906–07 (1st Cir.), *cert. denied*, 452 U.S. 962, 101 S.Ct. 3112, 69 L.Ed.2d 974 (1981). However, neither obstruction nor an endeavor to obstruct normally violates the statute unless there is a "corrupt" purpose,[1] and this brings us to the single most difficult legal issue in the case.

The scienter element in the obstruction statute is the subject of more confusing case law than can be described in brief compass. In part, this results from the promiscuous use in the cases of the ambiguous word "intent," which can mean either *knowledge* (of consequences) or *purpose* (to achieve them), *see* Model Penal Code § 2.02 & explanatory note (Official Draft 1962); in part, it results from the great range of varying motives that can underlie a refusal to testify (*e.g.*, loyalty of various kinds, concern as to reputation, fear of reprisal, concern about self-incrimination). Further, cases that purport to be setting legal standards are often instead concerned with the inferences to be drawn from particular facts.

The issue, and this case, would be very easy if one accepted the view advanced in the government's brief that it is sufficient for the contemnor to know (*i.e.*, be aware) that silence will in fact obstruct. Some language in cases arguably supports this view although it is rarely the focus of the discussion. *See, e.g., Marquardo*, 149 F.3d at 45–46; *United States v. Voss*, 82 F.3d 1521, 1531 (10th Cir. 1996). Further, there is a textual argument for this result growing out of a 1996 amendment to the Criminal Code, which provides that:

> As used in [18 U.S.C.] section 1505 [a sister provision to section 1503], the term "corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or *withholding*, concealing, altering or destroying a document or other information.

18 U.S.C. § 1515(b) (emphasis added). But that amendment, which is not itself directly applicable to section 1503, turns out to have a very narrow purpose.[2]

More important, the government's reading of the obstruction statute would not only make the "corruptly" requirement meaningless, but it would make an obstruction of justice out of refusals to speak that no one could have intended to punish. For example, every lawyer who advises a client to invoke the Fifth Amendment before the grand jury on a material issue, and almost every client who takes this advice, must "know" that this will often obstruct the grand jury, yet only a *corrupt* purpose creates guilt. *See Cintolo*, 818 F.2d at 990–94. In short, to make any sense out of the statute, "corruptly" needs to have some content beyond mere knowledge of consequence.

■ There is no hope in one opinion of providing a definitive gloss on the word "corruptly"; neither would it be wise to try. However, we think it is ordinarily sufficient

---

1. A corrupt purpose is not independently required if the obstruction is by "threats or force, or by any threatening letter or communication," 18 U.S.C. § 1503(a), but there is no claim in this case that Brady used force or threats or endeavored to do so.

2. As explained on the floor of Congress, the provision was to make clear that lying or otherwise obstructing Congress was covered by section 1505, and to counter any suggestion of undue vagueness made in *United States v. Poindexter*, 951 F.2d 369 (D.C.Cir.1991). *See* 142 Cong. Rec. § 11605–02, § 11607–608 (1996).

to satisfy the "corruptly" requirement in the statute—without regard to other circumstances that might also establish corruption (*e.g.*, offering a bribe)—if the contemnor's *purpose* for refusing to testify is to prevent the grand jury from locating the criminals. This is broadly consistent with a standard instruction for the obstruction statute,[3] captures most of the malign cases, and will need qualification only in the rare cases where such a purpose may be privileged by law or otherwise.

■ Here, there is no doubt that the district judge found that Brady's purpose was to hinder the grand jury. Rejecting the view that Brady was merely an onlooker, the judge said at sentencing that Brady "was in the thick of it apparently" and then three pages later elaborated:

I find by a fair preponderance of the evidence ... that Mr Brady was involved with the other two, that ... he in fact has knowledge of their plans, and that the stealing of the Bonneville was in some way related to the general plan for which the minivan, the minivan [sic] was stolen. I find that for sentencing purposes that his obdurate refusal to testify is part and parcel of his involvement with these individuals, and that the accessory after the fact guideline is appropriate.

Given deliberate obstruction of justice, it then follows that the severe offense level prescribed in the accessory after the fact guideline must be used where—as here—the offense involved "obstructing the investigation or prosecution of a criminal offense." U.S.S.G. § 2J1.2(c)(1).

■ The much closer issue is whether the evidence permitted the district court to find that Brady was part of the robbery plot or at least was involved in a phase of it. The burden of proof was upon the government to bring the case within the obstruction guideline. *See Ryan*, 964 F.Supp. at 531. On the other hand, the district court was not limited to evidence that would be admissible in court or that established facts "beyond a reason-

able doubt." *See United States v. Gonzalez–Vazquez*, 34 F.3d 19, 25 (1st Cir.1994). And, further complicating Brady's appeal, the district court's raw findings of fact must stand unless they are "clearly erroneous." *See id.* at 24.

The "evidence" available to the district court is virtually all summarized—indeed, is comprised by—four paragraphs of the pre-sentence report. This may be nothing more than the version supplied by the government's lawyer, but where accepted by the probation officer, it is sufficient unless rebutted, *see Gonzalez–Vazquez*, 34 F.3d at 25, and Brady did not seek to rebut the raw facts (although he did and does challenge the inferences to be drawn). The paragraphs are as follows:

(12) On an evening in late July of 1996, **Robert Brady** and two of his closets [sic] friends, Brendan Brennan and Paul James Hansen, went from their home neighborhood in the Charlestown section of Boston to the North End neighborhood of Boston for the purpose of stealing cars. At least one of these stolen cars was to be used in connection with a planned robbery of an armored car. **Brady** proceeded to steal a Pontiac Bonneville. Brennan and Hansen stole a minivan, which they had previously agreed to provide to other Charlestown men to be used in executing the armed robbery of an armored car.

(13) On July 31, 1996, the minivan stolen by Brennan and Hansen was in fact used by three masked men to rob a Dunbar armored car at the Twin City Plaza in Somerville, MA. During the course of this robbery, one of the robbers intentionally shot and killed, at point blank range, one of the armored car guards, Edward Kubera. Following the robbery and murder, the robbers made their escape in the stolen minivan.

(14) On August 23, 1996, agents of the FBI issued a grand jury subpoena requesting that **Brady** appear to provide fingerprints and photographing. The agents

---

3. "[T]he word 'corruptly' means simply having the improper motive or purpose of obstructing justice." 2 Sand et al., Modern Federal Jury Instructions, Instruction 46–6, at 46–24 (1998).

(This is a slight oversimplification, as *Sand* itself admits, *see id.* at 46–11, but it captures the thrust of the term.)

advised **Brady** that the information was being requested in connection with the investigation of the July 31, 1996 armored car robbery and murder, and of **Brady's** possible involvement in the incident. At that time, **Brady** stated: "I'm a car thief. So I stole a car. Big deal, everybody knows I'm a car thief."

(15) When **Brady** later appeared at the FBI to provide prints, he made reference to the incident under investigation, stating, I've always been "partial to the Bonneville," or words to that effect.

Different inferences are possible, but one that easily fits the facts is that Brady and his two friends went to steal two different vehicles for the proposed robbery—the minivan to be used in carrying out the robbery itself and the Bonneville as a temporary getaway car or for some similar purpose. This is suggested by the fact that Brady was friends with the other two, that they apparently traveled together to the same area in the North End for the thefts,[4] and that Brady had some kind of further knowledge that made him reluctant to testify to the grand jury.

Of course, it is possible that Brady and his two companions were on different missions and wholly ignorant of each other's plans. The line between a permissible inference and impermissible speculation is one of the hardest in the law to articulate since it is largely a matter of degree; much depends on how the factfinder conceives of likelihoods based on his or her real world experience and assumptions. Cf. Stewart v. Coalter, 48 F.3d 610, 616 (1st Cir.), cert. denied, 516 U.S. 853, 116 S.Ct. 153, 133 L.Ed.2d 97 (1995). About all we can say is that the district court does not seem to us "clearly erroneous" in finding it more likely than not that Brady was involved in the plot and that his refusal to testify was "part and parcel" of that involvement.

On appeal, the defense points to two other possible motives for Brady's refusal to testify, arguing that either is plausible and nei-

ther is corrupt. The first is that Brady was simply afraid of retaliation if he testified. If this had been Brady's controlling motive, we doubt very much whether we would regard it as corrupt, see United States v. Underwood, 880 F.2d 612, 620 (1st Cir.1989), but the point need not be definitively decided. Although Brady's counsel has done his best with a few scraps, the evidence of fear as the motive is so slight—Brady himself denied it—that we do not even think the matter worth discussing further.

Alternatively, Brady's counsel argues that his motive was merely a desire not to "rat" (an argument tending to bear out the suspicion that Brady did have something to rat about). Whether such a desire, if it stood as the only motive, would be "corrupt" is a very tricky question—perhaps not one entirely divorced from circumstances; a parent's refusal to testify against a child could easily be a punishable contempt (absent a privilege) but would be less easily described as "corruptly" motivated. In all events, the district court's findings essentially refute the notion that a desire to avoid ratting was Brady's predominant motive.

The district court findings that Brady was friends with the minivan thieves and somehow involved in the plot make it highly likely, and certainly more likely than not, that his refusal to testify was significantly motivated by a desire to frustrate the investigation of the robbery and thereby protect his friends. Cf. United States v. Tedesco, 635 F.2d 902, 907 (1st Cir.1980). Obviously the two motives—to obstruct and not to be a rat—will often go together; probably, they did so here. But a significant purpose to obstruct is enough, even if we assume dubitante that a pure desire not to rat would avoid the obstruction charge. Compare United States v. Ortiz, 84 F.3d 977, 981 (7th Cir.), cert. denied, 519 U.S. 900, 117 S.Ct. 250, 136 L.Ed.2d 177 (1996).

We have now come full circle. The findings of the district court are either findings of obstruction of justice by Brady or so close

---

**4.** The government's lawyer referred to the location of the two vehicles twice, once in an objection to the original presentence report apparently then accepted by the probation officer and once in the court hearing. Although strictly speaking this is not a finding of the presentence report, it is pretty close to a proffer by the government, and Brady never suggested that it was not true.

as to confirm that the analogy to the obstruction guideline is entirely apt. On different findings, the analogy could be weaker, might even fail, and could require resort to some other guideline. Without endorsing the topology offered in the opinion, we agree completely with *Ryan* that—even where the conduct is (as here) narrowed to a contemptuous refusal to testify to a grand jury—the choice of the best analogy depends upon the circumstances. *See Ryan,* 964 F.Supp. at 528–30.

The contempt penalty in this case is a severe one—87 months for a then 19–year–old youth with an otherwise clean record and a good many touching letters in his favor. Yet the high maximum set by the guidelines is *because* the robbery resulted in a murder, and Brady, through his refusal to testify, sought to obstruct this investigation. So long as his withheld evidence remains useful, he has it within his power to obtain a reduction in his sentence under the "substantial assistance" provisions, Fed.R.Crim.P. 35(b); U.S.S.G. § 5K1.1—a hard choice for Brady but one he has constructed for himself.

*Affirmed.*