USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1561

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 ROBERT HUGH BRADY,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. William G. Young, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Lynch, Circuit Judge.
 
 

 Leo T. Sorokin, Federal Defender Office, for appellant.
 Ben T. Clements, Assistant U.S. Attorney, with whom Donald K.
Stern, United States Attorney, was on brief for the United States.

February 26, 1999

 
 

 BOUDIN, Circuit Judge. Because this appeal involves
sentencing issues following a guilty plea, we take the background
facts from the presentence report that followed Robert Brady's
conviction for criminal contempt. See United States v. Gill, 99
F.3d 484, 485 (1st Cir. 1996). According to the presentence
report, Brady and two close friends traveled in late July 1996 to
Boston's North End from nearby Charlestown. The two friends,
Brendan Brennan and Paul Hansen, then stole a minivan; at about the
same time, Brady stole a Pontiac Bonneville parked several blocks
away from the minivan.
 Brennan and Hansen had previously agreed to steal a
vehicle for use by other Charlestown men in a planned robbery of an
armored car (Brady's involvement vel non is a separate matter
discussed below). On July 31, 1996, three masked men used the
stolen van to rob an armored car in a shopping plaza in Somerville,
Massachusetts. In the course of the robbery, one of the robbers
deliberately shot and killed one of the guards. Federal
authorities began an investigation.
 In the fall of 1996, Brady was photographed and
fingerprinted as part of the FBI's investigation of the robbery; in 
connection with this investigation, Brady made statements more or
less admitting that he had stolen the Bonneville. In March 1997,
Brady was summoned before the federal grand jury investigating the
robbery, and he took the Fifth Amendment; subsequently, Brady was
made the subject of an immunity order compelling him to testify
and providing that information he gave could not be used against
him. See 18 U.S.C. 6002.
 When Brady refused to testify despite the immunity order,
U.S. District Judge Saris held him in civil contempt and jailed him
until October 24, 1997, when the grand jury expired without
returning indictments against the robbers. At various times, the
government offered Brady protection against reprisal, but he still
declined to testify. Brady never suggested that he was concerned
about reprisals and affirmatively rejected the suggestion on one
occasion; he did say at least once that he intended not to "rat" on
anyone. On September 17, 1997, Brady was indicted for criminal
contempt for refusing to testify. See 18 U.S.C. 401(3).
 On January 30, 1998, Brady pled guilty to criminal
contempt before U.S. District Judge Young. On two different
occasions, both before and after the plea, Brady expressed a
willingness to testify if different conditions were met; one
condition (that no prior interview or proffer be required) was
agreed to, but the other (a promise that Brady would not be
prosecuted for perjury if he lied) was naturally rejected. After
postponing sentencing to allow further negotiations, Judge Young
held a final sentencing hearing on April 21, 1998.
 As we shall explain in more detail, the sentencing
guidelines provide that for criminal contempt, the court should
adopt the guideline for the most analogous criminal conduct. The
presentence report, which Judge Young adopted, recommended that
Brady be sentenced under the sentencing guideline that applies to
obstruction of justice, U.S.S.G. 2J1.2. The obstruction
guideline provides that where the obstruction interferes with a
criminal investigation, the offense level to be adopted is taken
from the guideline for the offense of accessory after the fact. 
See id. 2J1.2(c)(1).
 In the course of sentencing, Judge Young found that Brady
had been "involved" with Brennan and Hansen, that he knew of their
plans, and that Brady's theft of the Bonneville was "in some way"
related to the robbery. Accordingly, he employed the offense level
set forth in the accessory-after-the-fact guideline, U.S.S.G. 
2X3.1, which increases the offense level (up to a maximum of 30)
based on the underlying criminal conduct--here, a robbery and
murder. After an adjustment for acceptance of responsibility,
Brady's offense level was found to be 27. The district court
sentenced Brady to the maximum amount permitted by the guidelines--
87 months--and Brady now appeals. 
 On this appeal, Brady quarrels with the district court's
choice of guidelines, with its legal analysis, and with its
findings. In response, the government invokes our own recent
decision in United States v. Marquardo, 149 F.3d 36 (1st Cir.
1998), upholding use of the obstruction guideline in somewhat
similar circumstances. This case presents several issues that
recur in obstruction-related matters against a backdrop of
confusing case law; whether we can do much to clarify the case law
remains to be seen.
 Under the guidelines, the offense of criminal contempt
embraces misconduct so varied in type and context that "the
Commission has not provided a specific guideline for this offense." 
U.S.S.G. 2J1.1 app. note (1). Instead, the Commission in section
2J1.1 directs the court by cross reference to "apply the most
analogous offense guideline," U.S.S.G. 2X5.1 (Other Offenses),
while noting in section 2J1.1 app. note (1) that in some cases the
best analogy may be to U.S.S.G. 2J1.2, the obstruction of justice
guideline. See United States v. Ryan, 964 F. Supp. 526, 528 (D.
Mass. 1997).
 Brady argues that the choice of analogies is a question
of law, subject to de novo review. See United States v. Hornsby,
88 F.3d 336, 338 (5th Cir. 1996). Marquardo, by contrast, said
that the district court enjoyed some latitude in its choice,
especially where factual issues were involved. See 149 F.3d at 45. 
The truth is that the choice of an analogy can involve different
kinds of questions: abstract legal questions reviewed de novo, raw
issues of fact reviewed under the clearly erroneous standard, and
issues of law application (applying abstract standards to
particular facts) where deference is common but not invariable. 
See Sierra Fria Corp. v. Donald J. Evans, P.C., 127 F.3d 175, 181
(1st Cir. 1997); see also United States v. Cefalu, 85 F.3d 964, 966
(2d Cir. 1996).
 Where the contempt is a refusal to testify before a grand
jury, courts have resorted to several different guidelines as
analogies, including the obstruction guideline, the misprision
guideline, and the guideline governing the refusal of a material
witness to appear. See Ryan, 964 F. Supp. at 528-30. No one of
these is the "right" answer as a matter of law for all cases of
refusal to testify; rather, the choice of the best analogy is
likely to depend in part on the circumstances. See Cefalu, 85 F.3d
at 966-68 & n.6. Once the circumstances are determined, the
district court's choice of an analogy should be upheld if it is
reasonable. See Marquardo, 149 F.3d at 45; Cefalu, 85 F.3d at 968.
 "Reasonableness" in this context means that the
defendant's conduct (including state of mind) is closely similar to
conduct that would constitute the crime set forth in the more
specific guideline selected as the analogy. Similarity, not
identity, is what is required for an analogy, and similarity does
involve judgment. Thus, some latitude for the district court on
this judgment call seems appropriate, but it is not unlimited. 
Either side may still argue on appeal that the similarity is fartoo slight or that there is manifestly a better analogy.
 Here, the district court chose as the analogy the
"obstruction of justice" guideline. Our presumption is that the
Commission intended the quoted phrase to have the same meaning as
the crime defined in 18 U.S.C. 1503, which is cross-referenced by
the guideline, U.S.S.G. 2J1.2, comment. (statutory provisions),
and we see nothing to rebut the presumption. The elements of the
obstruction offense--purely an issue of law--are defined by the
statute and interpretive case law. The pertinent statutory
language is as follows:
 Whoever . . . corruptly . . . influences,
 obstructs, or impedes, or endeavors to
 influence, obstruct or impede, the due
 administration of justice shall be punished as
 provided in [18 U.S.C. 1503(b)].

18 U.S.C. 1503(a).

 It is settled by case law that "the due administration
of justice" includes the operation of the grand jury, and that
depriving the grand jury of information may constitute obstruction
under the statute. See, e.g., United States v. Banks, 942 F.2d
1576, 1578 (11th Cir. 1991); United States v. Cintolo, 818 F.2d
980, 990 (1st Cir. 1987). Here, we think it was a fair inference
that Brady possessed some information that could assist the grand
jury; this is suggested by his association on the night of the
minivan robbery with two friends who stole the van used in the
robbery and by Brady's refusal to testify, which (given the
immunity order and absent a showing of actual fear) suggests that
he knew something useful. In all events the district court thought
that Brady had useful information and, as we will see, this view is
not clearly erroneous.
 The robbery grand jury may well have been obstructed
given that it was initially unable to indict, but actual
obstruction is not needed if the defendant "endeavors" to obstruct. 
18 U.S.C. 1503(a). "Endeavors" suggests both a purpose to
obstruct and some step in that direction. United States v.
Tedesco, 635 F.2d 902, 906-07 (1st Cir.), cert. denied, 452 U.S.
962 (1981). However, neither obstruction nor an endeavor to
obstruct normally violates the statute unless there is a "corrupt"
purpose, and this brings us to the single most difficult legal
issue in the case.
 The scienter element in the obstruction statute is the
subject of more confusing case law than can be described in brief
compass. In part, this results from the promiscuous use in the
cases of the ambiguous word "intent," which can mean either
knowledge (of consequences) or purpose (to achieve them), see Model
Penal Code 2.02 & explanatory note (Official Draft 1962); in
part, it results from the great range of varying motives that can
underlie a refusal to testify (e.g., loyalty of various kinds,
concern as to reputation, fear of reprisal, concern about self-
incrimination). Further, cases that purport to be setting legal
standards are often instead concerned with the inferences to be
drawn from particular facts.
 The issue, and this case, would be very easy if one
accepted the view advanced in the government's brief that it is
sufficient for the contemnor to know (i.e., be aware) that silence
will in fact obstruct. Some language in cases arguably supports
this view although it is rarely the focus of the discussion. See,
e.g., Marquardo, 149 F.3d at 45-46; United States v. Voss, 82 F.3d
1521, 1531 (10th Cir. 1996). Further, there is a textual argument
for this result growing out of a 1996 amendment to the Criminal
Code, which provides that:
 As used in [18 U.S.C.] section 1505 [a sister
 provision to section 1503], the term
 "corruptly" means acting with an improper
 purpose, personally or by influencing another,
 including making a false or misleading
 statement, or withholding, concealing,
 altering or destroying a document or other
 information.

18 U.S.C. 1515(b) (emphasis added). But that amendment, which is
not itself directly applicable to section 1503, turns out to have
a very narrow purpose.
 More important, the government's reading of the
obstruction statute would not only make the "corruptly" requirement
meaningless, but it would make an obstruction of justice out of
refusals to speak that no one could have intended to punish. For
example, every lawyer who advises a client to invoke the Fifth
Amendment before the grand jury on a material issue, and almost
every client who takes this advice, must "know" that this will
often obstruct the grand jury, yet only a corrupt purpose creates
guilt. See Cintolo, 818 F.2d at 990-94. In short, to make any
sense out of the statute, "corruptly" needs to have some content
beyond mere knowledge of consequence. 
 There is no hope in one opinion of providing a definitive
gloss on the word "corruptly"; neither would it be wise to try. 
However, we think it is ordinarily sufficient to satisfy the
"corruptly" requirement in the statute--without regard to other
circumstances that might also establish corruption (e.g., offering
a bribe)--if the contemnor's purpose for refusing to testify is to
prevent the grand jury from locating the criminals. This is
broadly consistent with a standard instruction for the obstruction
statute, captures most of the malign cases, and will need
qualification only in the rare cases where such a purpose may be
privileged by law or otherwise.
 Here, there is no doubt that the district judge found
that Brady's purpose was to hinder the grand jury. Rejecting the
view that Brady was merely an onlooker, the judge said at
sentencing that Brady "was in the thick of it apparently" and then
three pages later elaborated:
 I find by a fair preponderance of the evidence
 . . . that Mr Brady was involved with the
 other two, that . . . he in fact has knowledge
 of their plans, and that the stealing of the
 Bonneville was in some way related to the
 general plan for which the minivan, the
 minivan [sic] was stolen. I find that for
 sentencing purposes that his obdurate refusal
 to testify is part and parcel of his
 involvement with these individuals, and that
 the accessory after the fact guideline is
 appropriate.

Given deliberate obstruction of justice, it then follows that the
severe offense level prescribed in the accessory after the fact
guideline must be used where--as here--the offense involved
"obstructing the investigation or prosecution of a criminal
offense." U.S.S.G. 2J1.2(c)(1).
 The much closer issue is whether the evidence permitted
the district court to find that Brady was part of the robbery plot
or at least was involved in a phase of it. The burden of proof was
upon the government to bring the case within the obstruction
guideline. See Ryan, 964 F. Supp. at 531. On the other hand, the
district court was not limited to evidence that would be admissible
in court or that established facts "beyond a reasonable doubt." 
See United States v. Gonzalez-Vazquez, 34 F.3d 19, 25 (1st Cir.
1994). And, further complicating Brady's appeal, the district
court's raw findings of fact must stand unless they are "clearly
erroneous." See id. at 24.
 The "evidence" available to the district court is
virtually all summarized--indeed, is comprised by--four paragraphs
of the presentence report. This may be nothing more than the
version supplied by the government's lawyer, but where accepted by
the probation officer, it is sufficient unless rebutted, seeGonzalez-Vazquez, 34 F.3d at 25, and Brady did not seek to rebut
the raw facts (although he did and does challenge the inferences to
be drawn). The paragraphs are as follows:
 (12) On an evening in late July of
 1996, Robert Brady and two of his closets
 [sic] friends, Brendan Brennan and Paul James
 Hansen, went from their home neighborhood in
 the Charlestown section of Boston to the North 
 End neighborhood of Boston for the purpose of
 stealing cars. At least one of these stolen
 cars was to be used in connection with a
 planned robbery of an armored car. Bradyproceeded to steal a Pontiac Bonneville. 
 Brennan and Hansen stole a minivan, which they
 had previously agreed to provide to other
 Charlestown men to be used in executing the
 armed robbery of an armored car.

 (13) On July 31, 1996, the minivan
 stolen by Brennan and Hansen was in fact used
 by three masked men to rob a Dunbar armored
 car at the Twin City Plaza in Somerville, MA. 
 During the course of this robbery, one of the
 robbers intentionally shot and killed, at
 point blank range, one of the armored car
 guards, Edward Kubera. Following the robbery
 and murder, the robbers made their escape in
 the stolen minivan.

 (14) On August 23, 1996, agents of the
 FBI issued a grand jury subpoena requesting
 that Brady appear to provide fingerprints and
 photographing. The agents advised Brady that
 the information was being requested in
 connection with the investigation of the July
 31, 1996 armored car robbery and murder, and
 of Brady's possible involvement in the
 incident. At that time, Brady stated: "I'm a
 car thief. So I stole a car. Big deal,
 everybody knows I'm a car thief."

 (15) When Brady later appeared at the
 FBI to provide prints, he made reference to
 the incident under investigation, stating,
 I've always been "partial to the Bonneville,"
 or words to that effect.

 Different inferences are possible, but one that easily
fits the facts is that Brady and his two friends went to steal two
different vehicles for the proposed robbery--the minivan to be used
in carrying out the robbery itself and the Bonneville as a
temporary getaway car or for some similar purpose. This is
suggested by the fact that Brady was friends with the other two,
that they apparently traveled together to the same area in the
North End for the thefts, and that Brady had some kind of further
knowledge that made him reluctant to testify to the grand jury.
 Of course, it is possible that Brady and his two
companions were on different missions and wholly ignorant of each
other's plans. The line between a permissible inference and
impermissible speculation is one of the hardest in the law to
articulate since it is largely a matter of degree; much depends on
how the factfinder conceives of likelihoods based on his or her
real world experience and assumptions. Cf. Stewart v. Coalter, 48
F.3d 610, 616 (1st Cir.), cert. denied, 516 U.S. 853 (1995). About
all we can say is that the district court does not seem to us
"clearly erroneous" in finding it more likely than not that Brady
was involved in the plot and that his refusal to testify was "part
and parcel" of that involvement.
 On appeal, the defense points to two other possible
motives for Brady's refusal to testify, arguing that either is
plausible and neither is corrupt. The first is that Brady was
simply afraid of retaliation if he testified. If this had been
Brady's controlling motive, we doubt very much whether we would
regard it as corrupt, see United States v. Underwood, 880 F.2d 612,
620 (1st Cir. 1989), but the point need not be definitively
decided. Although Brady's counsel has done his best with a few
scraps, the evidence of fear as the motive is so slight--Brady
himself denied it--that we do not even think the matter worth
discussing further.
 Alternatively, Brady's counsel argues that his motive was
merely a desire not to "rat" (an argument tending to bear out the
suspicion that Brady did have something to rat about). Whether
such a desire, if it stood as the only motive, would be "corrupt"
is a very tricky question--perhaps not one entirely divorced from
circumstances; a parent's refusal to testify against a child could
easily be a punishable contempt (absent a privilege) but would be less easily described as "corruptly" motivated. In all events, the
district court's findings essentially refute the notion that a 
desire to avoid ratting was Brady's predominant motive.
 The district court findings that Brady was friends with
the minivan thieves and somehow involved in the plot make it highly
likely, and certainly more likely than not, that his refusal to
testify was significantly motivated by a desire to frustrate the
investigation of the robbery and thereby protect his friends. Cf.United States v. Tedesco, 635 F.2d 902, 907 (1st Cir. 1980). 
Obviously the two motives--to obstruct and not to be a rat--will
often go together; probably, they did so here. But a significant
purpose to obstruct is enough, even if we assume dubitante that a
pure desire not to rat would avoid the obstruction charge. CompareUnited States v. Ortiz, 84 F.3d 977, 981 (7th Cir.), cert. denied,
117 S. Ct. 250 (1996).
 We have now come full circle. The findings of the
district court are either findings of obstruction of justice by
Brady or so close as to confirm that the analogy to the obstruction
guideline is entirely apt. On different findings, the analogy
could be weaker, might even fail, and could require resort to some
other guideline. Without endorsing the topology offered in the
opinion, we agree completely with Ryan that--even where the conduct
is (as here) narrowed to a contemptuous refusal to testify to a
grand jury--the choice of the best analogy depends upon the
circumstances. See Ryan, 964 F. Supp. at 528-30.
 The contempt penalty in this case is a severe one--87
months for a then 19-year-old youth with an otherwise clean record
and a good many touching letters in his favor. Yet the high
maximum set by the guidelines is because the robbery resulted in a
murder, and Brady, through his refusal to testify, sought to
obstruct this investigation. So long as his withheld evidence
remains useful, he has it within his power to obtain a reduction in
his sentence under the "substantial assistance" provisions, Fed. R.
Crim. P. 35(b); U.S.S.G. 5K1.1--a hard choice for Brady but one
he has constructed for himself.
 Affirmed.